Argued September 17, affirmed December 2, 1959

In re Estate of John Christoff
In re Estate of John Michailoff
In re Estate of Peter Mito Chernacoff
STATE LAND BOARD v. ROGERS
347 P. 2d 57

*Lillian C. Scott,* Washington, D. C., argued the cause

for appellant. With her on the briefs were Dallas S. Townsend, Assistant Attorney General, Director, Office of Alien Property, Washington, D. C.; C. E. Luckey, United States Attorney for the District of Oregon, Portland; Victor E. Harr, Assistant United States Attorney, Portland; George B. Searls, Washington, D. C.; Irwin A. Seibel, Washington, D. C.; and John J. Pajak, Washington, D. C.

*Catherine Zorn*, Assistant Attorney General, Salem, argued the cause for petitioner-respondent. With her on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McAllister, Chief Justice, and Warner, Sloan and King, Justices.

WARNER, J.

This is an appeal from decrees in three separate estates, each of similar tenor in proceedings for escheat in each of the three estates. All were adverse to the claims of the United States Attorney General, appearing in his capacity as Alien Property Custodian, claiming that the interests of the several heirs be awarded to the Custodian by reason of Vesting Orders filed by him in each estate. The state of Oregon, acting by and through the State Land Board, is the petitioner-respondent, and William P. Rogers[1], as Attorney General of the United States, and successor to the Alien Property Custodian, is defendant-appellant. We will refer to the petitioner-respondent as "the State" and to the appellant as "the Custodian."

By reason of certain factors of law and fact common to the escheat proceeding in each estate, they

---

[1] By order of this court, made March 31, 1958, William P. Rogers, successor to Herbert Brownell, Jr., as Attorney General of the United States, was substituted for Brownell, who appeared as defendant at the time of trial and initiation of these appeals.

were consolidated in the court below for the purpose of trial and later consolidated in this court for the purpose of argument.

The decedent in each instance was of Bulgarian descent, residing in Multnomah County, Oregon, at the time of his death, and who, dying intestate, left heirs who were residents of Bulgaria.

The decedent John Christoff died October 21, 1940, leaving as his only heirs a brother and two sisters. The decedent Peter Mito Chernacoff died August 23, 1944, with a wife and son surviving. The decedent John Michailoff, who died January 20, 1945, was survived by a half brother. All three decedents left as assets personal property of values varying from $3,153 to $3,500. Michailoff, alone, was the owner of real property at the time of his death. But real property was not within the reach of § 61-107, OCLA, the state statute applicable at the time of the death of the three decedents.

In each estate the then Custodian, duly made and filed a vesting order under the authority of the Trading with the Enemy Act (40 Stat 411, as amended, 50 USCA App § 1 et seq). By each vesting order the Custodian sought to vest in himself for the benefit of the United States whatever right, title, interest or claim each group of Bulgarian heirs had in or to the estate of their respective decedent relative.

■ Shortly after the initiation of the probate in the three estates mentioned and before the closing of the probate in each estate, the State filed a petition for escheat seeking to have the personal property of the respective decedents declared as escheated to the Oregon State Land Board. The State predicates its claim upon the ground that each decedent died without heirs or next of kin entitled to receive any of the personal property of his relative's estate. The State relies solely

upon § 61-107, OCLA®, supra, in support of its contention.

Both parties agree upon the foregoing statement of basic facts.

In the hearing in the circuit court, the evidence adduced was limited solely to the question of whether or not the laws of Bulgaria, at the time of the death of each decedent, met the standards established by § 61-107, OCLA, so as to entitle each Bulgarian nonresident national to take and receive his respective inheritance in Oregon.

In the decrees entered in each estate, the probate court found that the evidence failed to establish that the laws of Bulgaria in effect as of the date of each decedent's death disclosed the existence of the rights of American citizens as required by § 61-107, OCLA. The court, therefore, granted an order of escheat as to the personal property in each estate. It is from these decrees that the Custodian appeals.

As we have previously indicated, the controlling statute in this matter is § 61-107, OCLA. It reads:

> "The right of aliens not residing within the United States or its territories, *to take* personal property or the proceeds thereof in this state by descent or inheritance, is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal

® ORS 111.070 is our present statute on the subject of reciprocal inheritance laws, enacted in Oregon Laws 1951, ch 519, § 2. This same act repealed § 61-107, OCLA, and reenacted substantially all found in the earlier act with some additional new matter.

In the Code Reviser's "Notes of Decisions," compiled early in 1953, on ORS sections of ch 111, Descent and Distribution, the following statement appears relating to ORS 111.070:

"A prior similar statute withholding the right of nonresident aliens to take personal property by descent or inheritance unless reciprocal rights were given by the foreign countries to citizens of the United States denied equal protection and due process of the law under U. S. Const. Amend. XIV, § 1. Namba v. McCourt & Neuner, (1949) 185 Or. 579, 204 P. (2d) 569."

The foregoing statement by the Reviser is in error, by reason of a misprint of the original in the Oregon Reports. This is disclosed and explained by Mr. Justice Brand in Re Estate of Krachler, 199 Or 448, 456, 263 P2d 769 (decided November 12, 1953).

property or the proceeds thereof in like manner within the countries of which said aliens are inhabitants or citizens, and upon the right of citizens of the United States *to receive,* by payment to them within the United States, or its territories, moneys originating from estates of persons dying within such foreign countries. In the event no heirs other than said aliens are found eligible to take such property, said property shall escheat to the state of Oregon, as provided by law in those cases where a person shall die intestate without heirs." (Emphasis ours.)

The act requires from the nonresident alien heir two phases of proof as a condition precedent to taking and receiving any personal property by descent or inheritance: (1) proof of a reciprocal right of American citizens to take personal property by descent or inheritance, or its proceeds, from a foreign estate as aliens are permitted to take in Oregon; and (2) proof of the right of American citizens *to receive, by payment to them within the United States or its territories,* moneys originating from estates of persons dying in such foreign country.

■■ The burden of such proof rests upon the nonresident alien claiming as an heir. But in the instant matter, the burden reposes upon the appellant Custodian who by vesting orders has succeeded to the interests of the nonresident alien relatives of the several decedents. See *In re Estate of Krachler,* supra (199 Or at 473); *In re Braun's Estate,* 161 Or 503, 514, 90 P2d 484.

It is contended by the Custodian that the Bulgarian laws permit citizens of the United States not residing in Bulgaria "to take" and "to receive" inheritances of personal property or the proceeds thereof in the same manner that Oregon law gives to Bulgarian legatees.

The position of the State, as reflected by its brief, is to the contrary. However, during the course of oral argument, counsel for the State conceded that the sole issue before us is the "right to receive." This is tantamount to an admission that the law of Bulgaria, as of the dates of death of the several decedents, did confer on American legatees the same "right to take" which the Oregon law gives to Bulgarian legatees. We concur in the concession made by the State, and therefore, we need only to address ourselves to a consideration of the "right to receive."

■ The laws of Oregon carry no inhibitions nor limitations on the right of an heir or legatee *to receive* whatever personal property the heir is found entitled "to take" once an order of distribution is made. The statement applies with equal force to alien beneficiaries who are citizens or inhabitants of foreign countries and the laws of the country of their residence accord to citizens of the United States the same rights and privileges in like manner which Oregon grants to aliens. This court has not heretofore had occasion to construe or apply that part of § 61-107, OCLA, supra, relating to the "right to receive." It is apparent from an examination of the earlier cases that the results turned upon a determination of the nonexistence of a reciprocal "right to take," and, therefore, precluded the necessity for consideration of any question relating to the "right to receive." This we now meet for the first time. Although in *In re Estate of Krachler,* supra (199 Or at 478), we took note of certain German law bearing on the "right to receive," it was said at page 499: "We deem it unnecessary to the decision of this case for the court to consider what rights Americans might have had to 'receive by payment to them within the United States * * * the amount of the legacies.' If there was no right to inherit, the ques-

tion as to the right to receive would be immaterial. * * * ”

■ We cannot accept as correct, the Custodian's suggestion that the "right to receive" payment, as well as the right to take an inheritance, is a reciprocal right. When we read § 61-107, OCLA, supra, we find that the right to receive by payment in the United States or its territories is not there qualified as a reciprocal right as is the right to take by inheritance. It is clearly stated that the right of nonresident aliens to take or inherit depends "upon the [further] right of citizens of the United States *to receive*, by payment to them within the United States, or its territories, moneys originating" from foreign estates. (Emphasis ours.) This secondary "right" is not modified by the word "reciprocal." In this respect, the Oregon statute is unlike the California statute, wherein the word "receive" is not employed, nor is there any secondary condition as in § 61-107, OCLA, supra, that the right to receive payment as to personal property be made in the United States or its territories.[8]

■ As delineated in the Oregon statutes, the right "to take" and the "right to receive" are separable. Under the Oregon statute the "right to receive" connotes more than a legal right to be invested with title. As there used it comprehends a right to receive a physical delivery of the inheritance at a certain place, i.e., that is, within the boundaries and jurisdiction of the United States.

■ The existence of the "right to receive," as well as the "right to take," under the statute is determined by the status of the Bulgarian law as it was at the dates of the death of the respective decedents;

---

[8] See in re Arbulich's Estate, 41 Cal2d 86, 257 P2d 433, and Deering, California Probate Code, § 259 (Am Stat 1945, ch. 1160; Stats 1947, ch 1042).

that is, John Christoff, on October 21, 1940; Peter Mito Chernacoff, on August 23, 1944; and John Michailoff, on January 20, 1945. *In re Estate of Krachler,* supra (199 Or at 453 and 462); *Clostermann v. Schmidt,* 215 Or 55, 63, 332 P2d 1036.

In so saying, we do not mean to construe the statute as demanding that inheritance be received the very day the decedent died. There necessarily must be a reasonable delay incident to the administration of any estate before the distribution of inheritances is in order. In adopting the death date of a given decedent for the determination of the existence or nonexistence of the "right to receive" under foreign law, we mean to convey that it must appear under the foreign law, as of that time, that American heirs could expect to receive unrestricted payments of their inheritances from the foreign country in due course. Or to put it otherwise: an American heir of a specific decedent would have received payment of his inheritance at the date of the decedent's death had the estate been ready for distribution as of that date.

We now turn to the record to discover what was the law of Bulgaria as of the critical death dates present in this matter which bear upon the right of American citizens to have received payment of inheritances as of those dates. This takes us to a consideration of the Bulgarian foreign exchange laws existent at those particular times.

The Custodian contends that this phase of Bulgarian law granted American heirs a right to receive payment which was not violated by the foreign exchange laws since the only condition imposed by these laws was a license and that such licenses were issued "as a matter of course." We cannot concur in that conclusion.

The exchange laws of a given foreign country

have a unique bearing on the matter of the right of an American to receive an inheritance from a foreign estate, in that § 61-107, OCLA, supra, mandates the proceeds therefrom must be received in the United States or its territories. It matters little how otherwise generous or clear the foreign law may be with respect to the rights of an American citizen to take and receive a given inheritance, if its foreign exchange law can or may be employed to frustrate the delivery of such inheritance in the United States.

Although, as we have already observed, the Krachler case, supra, did not have to consider the right to receive, it did, however, take notice that the laws of Germany designed to control foreign exchange concerned the right to "'receive by payment' as distinguished from the right to 'take', that is, to inherit. OCLA, § 61-107"; adding, and we think significantly: "Further discretionary authority appears in this law: [the German act to control exchange]." (199 Or at 478). We say "significantly" because the entire tenor of Justice BRAND's opinion in the Krachler case implicitly decries, as insufficient, any pertinent foreign law which makes the rights of American citizens to inherit dependent upon the discretion of any foreign authority.

The Bulgarian Laws regarding Trade with Foreign Currencies was enacted in 1929 and published in the Durzhaven Vestnik (Official Gazette No. 72) (State's Ex. No. 5, translated by State's Ex. No. 6), hereinafter referred to as "the Law." A translation of Regulations promulgated as of October 28, 1931, under Section 8 of that law are found in State's Ex. No. 7, hereinafter referred to as "the Regulations." The Law and Regulations have been in effect since the dates of their adoption and hence determinative of an American citizen's "right to receive payment" as

of each of the critical death dates of the several decedents whose estates are here involved. The foregoing conclusion finds support in the testimony of Dr. Risoff, a former Bulgarian national and the Custodian's expert witness on pertinent Bulgarian law affecting the rights of the Bulgarian heirs to take under § 61-107, OCLA, supra. He stated in response to Cross-Interrogatory 5 of his deposition:

"*  *  *  Concerning the second part of the question, whether proceeds may be received from estates of persons dying in Bulgaria, *the answer can be found in the Law regarding Trade with Foreign Currencies, on July 1, 1929,* which provides that all transactions with foreign currencies shall be conducted under the control of the Bulgarian National Bank." (Emphasis ours.)

As indicated by Dr. Risoff, Section 1 of the Law places all transactions in foreign exchange under the monopolistic control of the Bulgarian National Bank④. This is fortified by Section 2, exonerating the Bank from all responsibility for its refusal to grant a person foreign exchange⑤. Section 3 limits purchase and sale of foreign exchange to the extent of covering actual necessities only⑥.

④ "Section 1. All transactions in foreign exchange (foreign bills of exchange and banknotes) shall be made under the control of the Bulgarian National Bank.
"Whenever a State orders restrictions upon trading with her currency, the Bulgarian National Bank may discontinue the transactions with this currency."
⑤ Section 2 provides in part: "The Bulgarian National Bank shall bear no responsibility for refusal to grant a person foreign exchange."
⑥ Section 3 reads in part as follows: "Banks may purchase and sell foreign exchange on behalf of their clients for the purpose of covering their actual needs only through (via) the Bulgarian National Bank and at rates of exchange fixed by it; all other transactions (loans, discounts, etc.) with such foreign exchange, they may make under the control of the Bulgarian National Bank after the examination of the necessity for the demand. The urgency of transactions, as well as all other details, shall be determined by regulations.

*    *    *    *    *

"Money-changers and bankers shall be prohibited from the purchase and sale of foreign bank notes and checks of stable and non-stable foreign currency for which the (Bulgarian National) Bank does not publish any rate of exchange.  *  *  *"

Section 4 of the Law prohibits the export of Bulgarian bank notes, gold coin, or Bulgarian securities. Section 7 prescribes penalties; and Section 8 authorizes the bank to issue regulations for the implementation of the foreign exchange control law.

Article 1 of the Regulations reiterates the monopolistic control of the Bulgarian National Bank, and Article 3 of the Regulations not only restricts issuance of foreign exchange to proof of actual need, but further limits the issuance to special circumstances and conditions therein set forth[7].

■ The Custodian argues that under Article 21 of the Regulations, an American heir could dispose of his accounts by payments within Bulgaria and abroad and by transfers to others by telegraph or check; the only condition necessary to convert Bulgarian lewa into other currency being to first obtain a license so to do from the Bulgarian National Bank, adding: "Thus, upon meeting this condition, an American heir had, under Bulgarian law, a legal right to receive payment here." We are not persuaded by these representations. In the first place, our examination of Article 21, when read in the context of the Regulation of which it is a part, does not warrant the Custodian's conclusions as to its scope as a benefit to American heirs. In the second place, even if the postulate of the Custodian is correct, it would not effectuate the kind of payment contemplated by § 61-107, OCLA, supra, i.e.: "The right * * * to receive, by payment to them within the United States

---

[7] "Article 3. Distribution of Foreign Exchange Media. Foreign exchange is being distributed only upon proved actual need and only to those persons and firms who do not have at their disposal foreign money of their own:

"a.) For the importation of goods * * *.
"b.) Against bills of lading. * * *
"c.) For freight, insurance, maritime insurance, * * *.
"d.) For travelers upon production of a passport * * *."

\* \* \* moneys originating from estates \* \* \* within \* \* \* foreign countries." We hold to the view that receipt of payment in the United States envisions a delivery in the United States which was originated and implemented by someone in the foreign country where the estate was probated authorized to make distribution and delivery of inheritances to decedents' heirs. And, lastly, under the Custodian's concept of the Regulations' Article 21, the right to transfer is contingent upon securing a license from the Bulgarian National Bank before the privileges conferred by that section can be enjoyed, if, indeed, those privileges are as broad and effective as the Custodian would have us believe.

■ The Custodian, relying on the testimony of Dr. Risoff, frequently represents that the issuance of such licenses was "a matter of course" and not dependent on the will or discretion of the Bulgarian Bank. Such an assertion is, at best, a mere conclusion of that witness, wanting in factual support. Even though testimony might have been marshaled to give it substance as a matter of banking history up to that time, the fact remains that the ultimate "right to receive payment" under the Law and Regulations is not a certain one, but depends upon the discretionary will of those who are officials of the Bulgarian National Bank. What the Bulgarian National Bank may have done yesterday, "as a matter of course," in the exercise of its powers of discretion, may not be the rule or custom of tomorrow. The condition imposed by § 61-107, OCLA, supra, demands legal certainty of payment, and not a payment dependent upon the whim of any person or institution of the foreign country where the right to take the inheritance originates.

Upon the record before us, we conclude that the

law of Bulgaria, as it was at the time of the deaths of the three decedents in this matter, did not give assurance that a citizen of the United States would receive payment of the proceeds of a Bulgarian inheritance in the United States or its territories. To the contrary, such payments were made a matter of grace or individual indulgence on the part of the Bulgarian National Bank, and hence wanting in the certainty of payment contemplated by § 61-107, OCLA.

Affirmed.