Argued December 16, 1959, reversed January 13, petition for rehearing denied March 1, 1960

IN THE MATTER OF THE ESTATE OF
JOE STOICH, DECEASED
STATE LAND BOARD *v.* KOLOVRAT ET AL

IN THE MATTER OF THE ESTATE OF
MUHAREM ZEKICH, DECEASED
STATE LAND BOARD *v.* ZEKICH ET AL
349 P. 2d 255

*Catherine Zorn,* Assistant Attorney General, Salem, argued the cause for appellant. With her on the briefs was Robert Y. Thornton, Attorney General, Salem.

*Peter A. Schwabe,* Portland, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Lusk, Warner and Sloan, Justices.

WARNER, J.

We are presented with an appeal from decrees in the estates of Joe Stoich and Muharem Zekich, arising from proceedings for escheat in each estate instituted by the State Land Board, hereinafter referred to as the State.

Stoich died intestate in Multnomah county on December 6, 1953, leaving as his only heirs a sister, four nephews, and three nieces, all residents of Yugoslavia.

Zekich likewise died intestate in the same county on December 17, 1953, leaving as his only heirs two sisters, two brothers, two nephews, and three nieces, who are also residents of Yugoslavia.

All the heirs of each decedent are made parties defendant and appear therein by their attorneys in fact.

Because of the similarity of basic facts and questions of law common to both proceedings, the two matters were consolidated in the probate court for the purpose of trial and later consolidated in this court for the purpose of argument.

The position of the State is: that each decedent died without heirs or next of kin entitled to receive any part of his or her relative's estate. It premises its case upon ORS 111.070 (Oregon Laws 1951, ch 519, § 1).

From orders denying the State's petitions for escheat and determining the right of the several defendants as alien heirs to take their respective distributive shares in the estates to which they lay claim, the State appeals.

This is the first appeal to reach this court from orders made pursuant to ORS 111.070, supra. Heretofore, all of the appeals in like matters had their origin in the earlier counterpart to the present statute, namely, § 61-107, OCLA (Oregon Laws 1937, ch 399, § 1).[1]

---

[1] The provisions of § 61-107, OCLA, in their entirety will be found in State Land Board v. Rogers, 219 Or 233, 347 P2d 57, decided December 2, 1959.

ORS 111.070, the controlling statute, provides:

"(1) The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:

"(a) Upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such alien is an inhabitant or citizen;

"(b) Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

"(c) Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries.

"(2) The burden is upon such nonresident alien to establish the fact of existence of the reciprocal rights set forth in subsection (1) of this section.

"(3) If such reciprocal rights are not found to exist and if no heir, devisee or legatee other than such alien is found eligible to take such property, the property shall be disposed of as escheated property."

Speaking generally, the principal differences between the present statute and the former one dealing with the rights of aliens to take inheritances in Oregon estates are: (1) the significant words "in like manner"[2] do not appear in ORS 111.070, supra,

---

[2] See In Re Estate of Krachler, 199 Or 448, 263 P2d 769, what is there said at pp 458 et seq. concerning the important significance of the words "in like manner," now deleted.

thereby making the reciprocal requirements of the statute read as does its California counterpart on that subject (West, Annotated California Probate Code, 528 § 259); (2) the present act embraces inheritances in real, as well as personal, property; and (3) adds, as an additional condition to the taking, subsection (c) of Section 1, requiring proof that foreign heirs will receive their legacies without diminution by the government of the country where they claim citizenship.

The present act, as before, imposes on the alien nonresident heir the burden of proving the existence of the conditions precedent to qualifying one to take an inheritance in this state. These concurring conditions are: (1) that a reciprocal right existed as of the date of the decedent's death on the part of American citizens to take property from estates in the foreign country in which the alien resides, upon the same terms and conditions as the inhabitants and citizens of that foreign country; (2) that American citizens have the right to receive by payment to them within the United States moneys originating from estates in the foreign country; and (3) that the heirs and legatees in the foreign country will have the use, benefit and control of money or property originating from Oregon estates without confiscation by the foreign government.[9] Failure to sustain the burden imposed upon alien heirs by the preponderance of evidence as to any one of these three items of proof of right results in defeating the claim of the alien to

[9] Because of the frequency of reference to the California statute, supra, the decisions made in the instant appeal and our earlier decisions, we note that the California statute is unlike the current Oregon act in two noteworthy particulars: (1) it does not require evidence of the right of an American citizen to receive payment from a foreign estate in this country; or (2) proof that an alien heir to an estate in the United States will receive money from an estate here without diminution by acts of the government of the alien heir. See § 259 of California Probate Code, supra.

take under the statute. *In re Estate of Krachler,* 199 Or 448, 263 P2d 769; *State Land Board v. Rogers,* 219 Or 233, 347 P2d 57, 59, decided December 2, 1959.

The defendant heirs claim to have met the burden in every particular.

ORS 111.070 is, as was its predecessor, § 61-107, OCLA, a law of succession, which governs the rights of nonresident aliens to take and receive property in the estate of an Oregon decedent. *In re Estate of Krachler,* supra (199 Or at 454); *In re Knutzen's Estate,* 31 Cal2d 573, 191 P2d 747, 751. The date of death controls the succession to the property and the three required rights under ORS 111.070, supra, must be shown to have so existed under the law of the country of the alien claimant as of that date. *In re Estate of Krachler,* supra, (199 Or at 453); *State Land Board v. Rogers,* supra (347 P2d at 61).

The "rights" of which we speak, as employed in the current statute, have been defined to mean an unqualified right, enforceable at law. *In re Estate of Krachler,* supra (199 Or at 455, 457 and 502), and "definitely ascertainable" *In re Arbulich's Estate,* 41 Cal2d 86, 257 P2d 433, 439. These definitions exclude the concept of a right which may in any sense be limited or dependent upon an act of discretion or grace upon the part of any governmental authority or agency.

We have also held that the second right, i.e., the right to receive, means delivery of the proceeds of an inheritance from a foreign estate, not in the country where the foreign decedent left property, but a delivery to an Oregon heir in the United States or its territories, originated and implemented by some one authorized to make distribution and delivery of in-

heritances to the decedent's Oregon heir. *State Land Board v. Rogers,* supra. Moreover, the second right is not reciprocal in character; that is to say, it is not dependent upon the existence of a law of the foreign country that the alien heirs and nationals of that foreign country who take from an Oregon estate must receive delivery of their Oregon legacy within the territory of that country. It is only the "right to take" which must be reciprocal in character. *State Land Board v. Rogers,* supra (347 P2d at 60).

In determining this appeal, we find it only necessary to address ourselves to the question of the existence or nonexistence of the second right under the Yugoslavian law; that is, whether there is a certain and enforceable right vested in American citizens to receive the proceeds of a Yugoslavian inheritance in this country.

At the outset, we note that the defendants have placed much in the record concerning laws, regulations and customs prevailing in Yugoslavia at the time of the trial (April, 1957) which may have come into existence subsequent to December, 1953 (the crucial date for the determination of the rights of the Yugoslavian heirs to take the estates involved in this proceeding). It is, therefore, not always clear to us whether all of the given matter reflected by approximately 85 documents apply to things existing in December, 1953, or to matters arising thereafter. This is well exemplified with reference to the current Article 8 of the Yugoslavian Foreign Exchange Law upon which the defendants rest no small part of their argument, and to which we will later make fuller reference.

The exchange laws and regulations of a given country have been recognized or treated as conclu-

sively determinative of an Oregon citizen's right to receive his inheritance "within the United States or its territories." *In re Estate of Krachler,* supra (199 Or at 478); *State Land Board v. Rogers,* supra (347 P2d at 61).

The Yugoslavian Law Regulating Foreign Payments (Foreign Exchange Law), hereinafter referred to as the Law, as it was in 1947, and being the Law of Foreign Exchange as adopted in 1945, is set out in substantial entirety in *In re Arbulich's Estate,* supra (257 P2d at 438-439).④ Since 1945 is it evident from

---

④ The pertinent articles of the Foreign Exchange Law, as disclosed in In Re Arbulich's Estate, supra (257 P2d at 438-439) read:

"Article 1

"All financial transactions with foreign countries, as well as all transactions within the country in relation to foreign countries that may affect the development of the credit balance of our country and the international value of our domestic currency (foreign exchange transactions) are subject to the control of the Federal Minister of Finance (foreign exchange control).

"Article 2

"Primarily the following transactions are subject to control:

"(a) All transactions within the country and with foreign countries: in foreign exchange, claims and debts in foreign currency and other values in foreign currency;

"(b) All transactions with foreign countries: in domestic currency, credits and debits in domestic currency and other values in domestic currency;

"(c) All transactions with foreigners within the country, causing changes in property relations between our country and foreign countries; and * * *

"Article 3

"The term *transaction* from Articles 1 and 2 as used in this law means the transfer of values and metals and payments, it also means the establishment, cancellation and change of obligations and actual rights to values and metals, as well as changes of holders of rights and obligations.

"Article 4

"Permission must be had for transactions described in Articles 1 and 2 of this Law according to foreign exchange regulations.
"Article 5

"It is forbidden to conclude business in the country the amount of which in domestic currency is tied to gold or some foreign currency. * * *

"Article 6

"(1) The Federal Minister of Finance as the supreme foreign exchange authority, exercises his control over foreign exchange through: [various agencies] * * *

"(2) The Federal Minister of Finance regulates the limits of·jurisdiction as between the foreign exchange authorities in regard to the exer-

the following recital in the certificate accompanying Exhibit 30 that the Law was amended in 1946, 1951 and 1954. This certificate reads:

"In the Federal People's Republic of Yugoslavia are in force:

"I

"The Law regulating foreign payments (Foreign Exchange Law) published in the 'Official Gazette of the FPR of Yugoslavia No. 86 of October 23, 1946,' corrected and changed on the 8th October 1951 ('Official Gazette of the FPR of Yugoslavia' No. 46/1951) and on the 26th January 1954 ('Official Gazette of the FPR of Yugoslavia' No. 5/1954) which reads as follows: * * *."

---

cising of foreign exchange control, be it by Regulations from Article 25 of this Law, or by separate decisions.

"Article 7

"(1) Transactions, subject to foreign exchange control according to this Law, may be conducted only by persons and establishments authorized to do so by the competent foreign exchange authorities, unless the conduct of such business is permitted by the foreign exchange rules themselves.

"Article 8

"The National Bank, whenever authorized by the Federal Minister of Finance, may at any time request the holders in the country to offer for sale to the National Bank all their foreign exchange (regardless whether it be in the shape of claims in foreign currency, checks, drafts, etc.), foreign currency, foreign values and precious metals. If the National Bank decides to buy, it shall fix the terms, * * *

"Article 12

"(1) The term 'devisa' as used in the foreign exchange regulations means a claim abroad on whatever basis, in whatever currency, regardless of the manner of disposal * * *.

"Article 13

"(1) The term *foreigners* as used in this Law means all persons and corporations with permanent residence or seat abroad, regardless of citizenship of persons and ownership of enterprises.

"(2) The term *domestic persons* means all persons and corporations with permanent residence or seat within the country, regardless of citizenship of persons and ownership of enterprises. * * *

"Article 16

"(1) The penalties for foreign exchange infractions are: * * *

"2. Confiscation of objects or values constituting the foreign exchange infraction, in full or in part. * * *

"(2) The Federal Minister of Finance shall pronounce penalties.

"Article 25

"The Federal Minister of Finance shall issue more detailed rules, regulations and decisions for the execution of this Law, upon consulting the National Bank. * * *"

■ Notwithstanding this element of uncertainty as to what precisely was the Foreign Exchange Law in December, 1953, in contrast to what it was in 1947, we find upon examination little change in substance or legal effect wrought by the amendments made since 1947. Because of defendants' failure to supply the record with copies of the amendments, showing when made or other evidence of like character, we feel justified in assuming that the 1945 Exchange Law remained in effect during December, 1953. *Rusk v. Montgomery,* 80 Or 93, 101, 156 P 435; *Weygandt v. Bartle,* 88 Or 310, 317, 171 P 587; 31 CJS 744, Evidence § 124(4). See, also, *State ex rel. Grismer v. Merger Mines Corp.,* 3 Wash2d 417, 101 P2d 308, 310, where the rule is applied to the law of a foreign jurisdiction; *Martinez v. Gutierrez* (Tex), 66 SW2d 678; 31 CJS, supra, at 769.

Subsections (a), (b) and (c) of Article 2 of the Law of 1945, and as it was in 1946, single out the following transactions as the primary subjects of control:

"Primarily the following transactions are subject to control:

"(a) All transactions within the country and with foreign countries: in foreign exchange, claims and debts in foreign currency and other values in foreign currency;

"(b) All transactions with foreign countries: in domestic currency, credits and debits in domestic currency and other values in domestic currency;

"(c) All transactions with foreigners within the country, causing changes in property relations between our country and foreign countries; and * * * ."

The changes between Articles 1 and 2 of the Law of 1945 and as the same numbered articles appear in Exhibit 30 are immaterial.

*In re Arbulich,* to which we have made several previous references (decided May 26, 1953), is one of especial force and significance here. It was a proceeding to determine heirship in the estate of a California decedent which was claimed by a brother residing in the United States and by another brother who resided in and was a national of Yugoslavia. The decedent and the brother residing in California were former nationals of that country. The Superior Court entered a judgment to the effect that the brother residing in the United States was entitled to distribution of the entire estate. The Yugoslavian brother appealed. The Supreme Court held that evidence was sufficient to support the finding that on March 21, 1947, when decedent died, the rights of inheritance prescribed by § 259 of the California Probate Code did not exist with respect to either real or personal property as between the residents and citizens of the United States and Yugoslavia. Among other documents of importance before the court was the Foreign Exchange Law which we now review.

The court took notice of the amendments made to the 1945 Law in October, 1946, referring particularly to Article 24, as so amended (257 P2d at 439), saying:

"The second decree, effective October 25, 1946, confirms the decree of September 7, 1945, and amends it in various respects which appear to be largely immaterial here. However, Article 24 of the second decree [i.e., October, 1946], provides that 'The Minister of Finance of FPRY is herewith authorized to issue regulations, instructions, orders and decrees, for the execution of this law,' * * *."

We, therefore, feel warranted in saying that Article 24, as thus referred to in Arbulich, is identical with Article 24 as found in Exhibit 30 of the instant mat-

ter and the slight differences appearing may be credited to differences in translation. This justifies our conclusion that Article 24, as above quoted in Arbulich, was an integral and important element of the Law in December, 1953.

The court, continuing, stated:

"Appellant urges that the 'Foreign Exchange Law' has no materiality in relation to the question of reciprocity; that it is merely 'regulatory of foreign exchange and has no reference whatever to rights of inheritance.' But a reading of the entire substance of the documents mentioned makes it apparent that the trial court was justified in reaching the conclusion that under Yugoslav law a citizen of the United States, at the time of decedent's death, had no definitely ascertainable and enforceable right to *receive* Yugoslav property by testament, and that the receipt of any such property would depend in each case upon the largely, if not entirely, uncontrolled discretion of the Minister of Finance. This is far different from a standardized regulation which might merely delay the transmission of gold, money, or other stores of value from one nation to another. \* \* \*" (257 P2d at 439)

We also say, as did the California court, the Law has the effect of "confirming the apparently unlimited power of the Minister of Finance over foreign exchange transactions" and the absence of any "definitely ascertainable and enforceable right to *receive* Yugoslav property by testament, and that the receipt of any such property would depend in each case upon the largely, if not entirely, uncontrolled discretion of the Minister of Finance."

The rules authorized by Article 25 of the Law for the implementation of the regulation of foreign payments (hereinafter referred to as the Rules) are

460

found in Exhibit 31. They capture and intensify the absolute control of foreign exchange which the Law reposes in the Minister of Finance. This is illustrated by pertinent parts included in marginal footnote ⑤.

The record is replete with evidence of remittances from estates in Yugoslavia to persons in the United States and the testimony of Yugoslavian consular representatives and experts called by the defendants concerning the movement of such funds, all offered as proof that American citizens have in the past received their legacies by delivery in the United States. This phase of the case is further amplified by self-serving

---

⑤ "Foreign Exchange Regulations .

"Article 1
"Foreign exchange operations can be pursued only in accordance with the foreign exchange regulations, as well as authorization and permits delivered on the basis of the said regulations.

"Article 2
"1. The export of any means of payment and securities both in domestic and foreign currency, in any form (effective currency, foreign exchange, securities, coupons, etc.), both directly or indirectly (through other persons, the postoffice, etc.) *is not allowed without the permission of the competent foreign exchange authorities,* issued in conformity with the foreign exchange regulations. The export is exceptionally allowed in cases which are regulated in general, by the foreign exchange regulations (for instance, in passenger traffic).
"2. From foreign exchange regulations are exempted all exports of values enumerated in the present Article, effected by the Federal Ministry of Finance and the National Bank.
\* \* \* \* \*

"Article 12
"1. Foreign exchange operations may be pursued exclusively on the basis of permits issued by the competent foreign exchange authorities, if these operations are not allowed by the foreign exchange regulations themselves.
\* \* \* \* \*
"3. Likewise, all claims abroad which are not specifically mentioned in the foreign exchange regulations can be settled only after the permission of the Banking and Currency Department of the Federal Ministry of Finance has been obtained.

"Article 13
\* \* \* \* \*
"3. Foreign exchange operations depending on the authorization of foreign exchange authorities can be pursued exclusively by the persons to whom these permits have been issued on the basis of original permits."
(Emphasis ours.)

declarations of the same tenor from Yugoslavian diplomatic representatives to the State Department and documents emanating from officials in that country. Much of this is immaterial, having dates subsequent to December, 1953, or lacking of any identifying dates; some are deficient in other respects which are unnecessary to note because we are compelled to reject all evidence of this character as legally inconclusive of the problem we now have under consideration. Moreover, the testimony of the Yugoslavian officials, including the diplomatic correspondence referred to, serves at most to create a conflict in the evidence as to the ultimate fact of whether or not there exists as a *matter of law an unqualified and enforceable right to receive* as defined by ORS 111.070, supra. Nor is this answered by evidence that some American citizens have enjoyed the "right to receive" the proceeds of their respective inheritances in whole or in part. The real test is whether *all* American citizens under the law of Yugoslavia can demand and enforce that right under the law in contradistinction to a dependency upon the good will or gracious indulgence of some official of that country.

Even if it can be said these items of evidence do reveal a flow of exchange from Yugoslavia to American heirs as of December, 1953, they, at the most, only attest the indulgence of the Yugoslavian authorities as to the American heirs as of that time. Certainly, as discretionary acts, permissible under the Law, they do not evidence the presence of an unqualified and enforceable right to receive by delivery of funds in the United States to citizens thereof under the foreign exchange laws and regulations of that country in 1953. The fact that some American citizens were so favored does not preclude wonder-

ment as to how many may have been denied "the right to receive" or, indeed, whether those who did receive moneys by exchange, received all or only a part thereof. This line of evidence has many of the characteristics noted by Mr. Justice BRAND in the Krachler case, supra (199 Or at 499-502). What was done yesterday "as a matter of course" in the exercise of powers of discretion may not be the rule or custom of tomorrow. *State Land Board v. Rogers,* supra (347 P2d at 63).

Unless the area of alien succession over which the state of Oregon seeks to control through ORS 111.070, supra, has been preempted by some treaty agreement subsisting between Yugoslavia and the United States as of December, 1953, we are of the opinion that both the Yugoslavian Foreign Exchange Laws and Regulations extant as of that date operate as a denial of the claims of the defendants.

■ We are mindful that rights of succession to property under local law may be affected by an overriding federal policy when a treaty makes different or conflicting arrangements. In such event, the state policy must give way. *Clark v. Allen,* 331 US 503, 517, 91 L ed 1633, 1645, 67 S Ct 1431.

By way of circumventing the adverse effect of the Yugoslavian Law and Regulations, the defendants place great reliance upon their interpretation of Article II of the Convention for Facilitating and Developing Commercial Relations (sometimes called the Convention of Commerce and Navigation and by us hereinafter called the Treaty of 1881) as concluded on October 2/14, 1881, between the United States of America and Serbia (now a constituent part of Yugo-

slavia[©] (22 Stat 963, Treaty series 319). It is before us at Exhibit 9.

Article II of the Treaty of 1881 reads:

"In all that concerns the right of acquiring, possessing or disposing of every kind of property, real or personal, citizens of the United States in Serbia and Serbian subjects in the United States, shall enjoy the rights which the respective laws grant or shall grant in each of these states to the subjects of the most favored nation.

"Within these limits, and under the same conditions as the subjects of the most favored nation, they shall be at liberty to acquire and dispose of such property, whether by purchase, sale, donation, exchange, marriage contract, testament, inheritance, or in any other manner whatever, without being subject to any taxes, imposts or charges whatever, other or higher than those which are or shall be levied on natives or on the subjects of the most favored state.

"They shall likewise be at liberty to export freely the proceeds of the sale of their property, and their goods in general, without being subjected to pay any other or higher duties than those payable under similar circumstances by natives or by the subjects of the most favored state."

Proceeding on the theory that Article II of the Treaty of 1881 embraces the "right to receive," as well as the "right to take," the respondents rely on Article 8 of the Law, supra, offered by them as Exhibit 28 as an exception to the operation of the

---

[©] Its present and continuing effectiveness is attested by The Settlement of Pecuniary Claims Against Yugoslavia Agreement between the United States of America and that country of July 19, 1948 (Exhibit 7 herein), as is confirmed by Article 5, reading:

"The Government of Yugoslavia agrees to accord to nationals of the United States lawfully continuing to hold, or hereafter acquiring assets in Yugoslavia, the rights and privileges of using and administering such assets and the income therefrom within the framework of the controls and regulations of the Government of Yugoslavia, on conditions not less favorable than the rights and privileges accorded to nationals of Yugoslavia, or of any other country, in accordance with the Convention of Commerce and Navigation between the United States of America and the Prince of Serbia, signed at Belgrade, October 2-14, 1881."

Foreign Exchange Law in so far as the "provisions of agreements with foreign countries are concerned with payment." The provisions of Article 8 of the current Law as reflected by that exhibit read:

"The term 'foreign exchange regulations' refers to the provisions of the present Law, to the provisions of the Rules for the implementation of the present Law, to the orders, instructions and decisions of the Ministry of Finance of the FPR of Yugoslavia, made on the basis of the present Law, to all the regulations relating to the control of imports and exports enacted by the Minister of Foreign Trade of the FPR of Yugoslavia, as well as to the provisions of agreements with foreign countries which are concerned with payments."

As we have previously observed, at pages 438 and 439 of *In re Arbulich's Estate,* supra, there is spread with great detail the Yugoslavian Foreign Exchange Law as it was at that time. Comparing Article 8 of the Law as it was then with the current Article 8 of the same Law indicates some amendments since 1947. But when? Was Article 8, as above quoted, in effect in December, 1953, or was it so enacted subsequent to that time? Although pressed by counsel for the state, the defendants' witness Temer, the Consul General of the Yugoslavian Consulate at San Francisco, was unable to say whether the current Article 8 of the Law was effective in December, 1953.

Assuming arguendo that the current Article 8 of the Law was prevailing in December, 1953, we find no difficulty in concluding that it gives some recognition to the provisions of Article II of the Treaty of 1881. But it is only to the extent that Article II has any impact upon the "right to receive" as defined by ORS 111.070, supra, would the later Article 8 become a matter of interest. We think, notwithstand-

ing what may be the date of its enactment, that it has no bearing on our present problem.

*Clark v. Allen,* supra, decided June 9, 1947, becomes a holding of prime interest in this matter in that it was precipitated by a proceeding initiated under § 259, California Probate Code as it was in 1942. It will be remembered that section bears upon the rights of aliens not residing in the United States to take real or personal property in the state of California.[7] And for the further reason that it construes a treaty provision similar to Article II of the Treaty of 1881.

In the Clark case, Alvina Wagner, a resident of California, died in 1942. She left real and personal property situate in that state. By a will, dated December 23, 1941, she bequeathed her entire estate to four relatives who were nationals and residents of Germany. Six heirs at law, who were residents of California, filed a petition for determination of heirship in the probate proceeding, claiming that the German nationals were ineligible as legatees under § 259, supra, of the California Probate Code. It appears that at the time of the decision in Clark, there had never been a hearing on that petition. This, for the reason that in 1943 the Alien Property Custodian vested in himself all right, title and interest of the German nationals in Mrs. Wagner's estate. The Property Custodian thereupon instituted an action in the U. S. District Court against the executor under the will and the California heirs at law for a determination that the California heirs had no interest in the estate and that he was entitled to the entire net estate upon the conclusion of the administration. The

[7] Sections 259 and 259.2 of the California Code, supra, are identical with ORS 111.070 (1) (a) and (b) and subsection (3).

District Court granted judgment for the Custodian on the pleadings (52 F Sup 850). The Circuit Court of Appeals reversed, holding that the District Court was without jurisdiction of the subject matter (147 F2d 136). The case went thence to the Supreme Court on certiorari where it was held that the District Court had jurisdiction of the suit and remanded the cause to the Circuit Court of Appeals (9th CC) for consideration on the merits (326 US 490). The Circuit Court of Appeals thereafter held for the California heirs (156 F2d 653). The case was returned again to the Supreme Court on a petition for a writ of certiorari which was granted on the ground that the issues raised were of national importance.

The defendants concede that the Clark case over the years has, since its pronouncement in 1947, come to be regarded as "the cornerstone of the entire reciprocal inheritance rights structure as it was the first major decision by a court of last resort on the California reciprocity statute."

In *Clark v. Allen,* supra, the court was called upon to construe Article IV of the Treaty of Friendship, Commerce and Consular Rights made with Germany December 8, 1923 (44 Stat 2132). It had different provisions relating to the testamentary disposition of realty and personalty. Article IV of the Treaty, which is the provision of our interest, contained the following provisions as to the disposition of personalty:

> "*Nationals of either High Contracting Party* may have full power to dispose of their personal property of every kind *within the territories of the other,* by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and

may take possession thereof, either by themselves or by others acting for them, and retain or dispose of the same at their pleasure subject to the payment of such duties or charges only as the *nationals of the High Contracting Party within whose territories* such property may be or belong shall be liable to pay in like cases." (Emphasis ours.) (91 L ed at 1644)

We are of the opinion that the following words and phrases found in the German Treaty of 1923: "Nationals of either High Contracting Party * * * within the territories of the other" are of the same import and meaning as the words and phrases found in Article II of the Treaty of 1881; that is, "citizens of the United States in Serbia and Serbian subjects in the United States," a phrasing which the defendants ascribe to Victorian English.

In the Clark case, it was held that the language of Article IV of the German Treaty applied only to nationals of either of the party nations who were *within* the territory of the other. Mr. Justice Douglas, speaking for the court, says at p 1644 L ed:

"* * * In case of personalty, the provision governs the right of 'nationals' of either contracting party to dispose of their property within the territory of the 'other' contracting party; and it is 'such personal property' that the 'heirs, legatees and donees' are entitled to take.

"Petitioner, however, presents a detailed account of the history of the clause which was not before the Court in Frederickson v. Louisiana, 23 How (US) 445, 16 L ed 577, supra, and which bears out the construction that it grants the foreign heir the right to succeed to his inheritance or the proceeds thereof. But we do not stop to review that history. For the consistent judicial construction of the language since 1860 has given it a character which the treaty-making agencies have

not seen fit to alter. And that construction is entirely consistent with the plain language of the treaty. We therefore do not deem it appropriate to change that construction at this late date, even though as an original matter the other view might have much to commend it.

"We accordingly hold that Article IV of the treaty does not cover personalty located in this country and which an American citizen undertakes to leave to German nationals. * * *"

The Supreme Court of California also had before it the provisions of Article II of the Treaty of 1881 in the Arbulich case, supra, which were there urged, as here, as applicable and controlling in favor of the appellant brother. Concerning this, Mr. Justice Schauer, who spoke for the court, stated:

"Appellant contends, nevertheless, that the provisions of Article II of a treaty entered into in 1881 between the United States and the Kingdom of Serbia, 22 Stat. 964 (of which the present Republic of Yugoslavia is the successor government) and certified by the Secretary of State of the United States as remaining in full force and effect between this country and Yugoslavia, are applicable and controlling in appellant's favor on the issue of reciprocity. It may be noted that the first paragraph of Article II seemingly treats only of 'citizens of the United States in Serbia [Yugoslavia] and Serbian [Yugoslav] subjects in the United States,' rather than, as is the situation in the present case, of a United States citizen who dies in the United States and leaves property to a Yugoslav subject who is *in Yugoslavia,* and therefore is not here applicable. Even if we assume its applicability in that respect, however, the rights granted are only those given by each of the contracting nations 'to the subjects of the most favored nation,' and do not purport to equal the rights given or guaranteed by each of the contracting nations to *its own* citizens. Consequently

the treaty provisions do not establish the reciprocal rights required by the Probate Code." (257 P2d at 437)

In that holding, we find the California court, and we think rightly, following the pattern of interpretation accorded the German treaty before the United States Supreme Court six years before in *Clark v. Allen,* supra. We take notice that a writ of certiorari in Arbulich was denied by the Supreme Court of the United States (346 US 897, 98 L ed 398, 74 S Ct 219) and later a petition for leave to file a petition for rehearing was also denied (347 US 908, 98 L ed 1066, 74 S Ct 426).

If we correctly appraise the position of defendants, they would, notwithstanding the doctrine of *Clark v. Allen,* supra, have us interpret the words "in Serbia" and "in the United States," as they appear in Article II of the Treaty of 1881, as referring to the place where property rights are granted rather than to the geographical location of the person claiming them. If thus construed the provision would accord to the nationals of either party wherever resident rights similar to those enjoyed by nationals of the most favored nation wherever resident. But this we decline to do, being impressed that the construction given to the German Treaty in the Clark case applies with equal force to the Serbian Treaty of 1881, and as also held in Arbulich's Estate.

At the time of *In re Arbulich,* as well as in 1953, the California state code (see § 259 California Probate Code) carried no provision comparable to subsection (b) of § 1 of ORS 111.070, requiring, as does the Oregon statute, the right "to receive by payment to them within the United States or its territories money originating from the estates of persons dying

within such foreign country." The right to receive as discussed by the court in Arbulich, was without the mandatory direction of the California act or that it be a receipt by delivery in the United States. In this respect, the Oregon act is much more stringent than the provisions of the California Probate Code or similar codes that have come to our attention. It is a difference which may well account for the ruling of the Los Angeles Superior Court of California in *Miloglav's Estate,* No. 301394, May 5, 1954, and which comes to our notice via defendants' Appendix F.

We are not informed as to the reasons which prompted the reenactment of subsection (b) of § (1) of ORS 111.070 in 1951, and as it was in § 61-107, OCLA, nor the new provision, subsection (c), of the same section of the present act relating to assurances that foreign beneficiaries of an Oregon estate receive the avails of their shares without confiscation by the government of the country in which said beneficiaries resided. But whatever was the legislative purpose, whether to circumvent then known practices of certain governments by way of diminishing or confiscating inheritances received by some of their citizens from Oregon estates or in barring the free movement of foreign inheritances to Oregon beneficiaries, we think it was clearly within the legislative province to prescribe the various conditions found in ORS 111.070. The protective solicitude by our legislature demonstrated by the provisions of ORS 111.070 in behalf of Oregon citizens is extended to alien heirs residing in foreign countries who inherit in Oregon. In short, the net result when observed, at least on the part of the state of Oregon, brings ORS 111.070 more in harmony with the spirit of the international agreements as contended for by defendants than their

interpretation of those treaties demand. In effect, subsections (b) and (c) of § (1) of that statute place local heirs and alien heirs on a parity by insuring to each the full measure of their respective inheritances. We deem both of these conditions a reasonable exercise of legislative power, and in no sense trespassing upon any international treaty or agreement brought to our attention, but to the contrary implementing the spirit, if not the letter, of such accords.

In arriving at our conclusions, we have given attention to the terms of what is commonly known as the Bretton Woods Agreement of 1944, cited by the defendants. Yugoslavia was one of the 44 participating governments at the United Nations Monetary and Financial Conference of that year. Later, it became one of the signatories to the Articles of Agreement formulated as the final act of the conference. The major features of the final document provided for establishment of the International Monetary Fund and of the International Bank for Reconstruction and Development. It is common knowledge that the conference was motivated by the then prevailing international apprehension world economy would suffer seriously as an aftermath of World War II unless some devices to stabilize it were quickly undertaken by the world powers. This thought is clearly affirmed by Article I of that agreement, wherein its controlling purposes and objectives are stated.

The defendants, however, point to its Art XIV, § 4 and Art XI, § 2, which provide sanctions against any member nation which imposes foreign exchange restrictions contrary to the provisions of the agreement. Although not fully developed by defendants' argument, the inference is that a foreign exchange system of controls and regulations was established thereby

which would nullify the restrictive character of the Yugoslav Foreign Exchange Law and implementing Regulations. The contrary is clearly evident from a reading of the entire agreement. It is replete with expressions recognizing the want of economic parity between the signing nations and the relative difficulties of some of the lesser nations in maintaining a sound monetary system, and definitely places them in an exceptional class. We turn for the moment to one of the very articles to which they point. It is significantly captioned "Transitional Period." Section 2 of that article is subcaptioned "Exchange Restrictions." Its provisions are spread in marginal note [8].

Article VII, § 3(b) of the agreement is also to the same tenor in recognizing that some nations will find the need to "impose limitations on the freedom of exchange operations."

The Bretton Woods Agreement gives no support to the thesis of defendants and, to the contrary, is in a large sense on international recognition that some countries, rightly or wrongly, would impose strictures such as are exemplified by the foreign exchange laws of Yugoslavia and Bulgaria (see *State Land Board v. Rogers,* supra).

By way of weakening or equivocating the applicability of *Clark v. Allen,* supra, we are cited the

[8] "In the post-war transitional period members may, notwithstanding the provisions of any other articles of this Agreement, maintain and adapt to changing circumstances (and, in the case of members whose territories have been occupied by the enemy, introduce where necessary) restrictions on payments and transfers for current international transactions. Members shall, however, have continuous regard in their foreign exchange policies to the purposes of the fund; and, *as soon as conditions permit,* they shall take all possible measures to develop such commercial and financial arrangements with other members as will facilitate international payments and the maintenance of exchange stability. In particular, members shall withdraw restrictions maintained or imposed under this Section as soon as they are satisfied that they will be able, in the absence of such restrictions, to settle their balance of payments in a manner which will not unduly encumber their access to the resources of the Fund." (Emphasis ours.)

opinions of the California Attorney General, dated July 15, 1942, listing foreign nations of that time with whom the Attorney General deemed reciprocal inheritance rights existed by reason of treaties. This listing included Yugoslavia. Notwithstanding that such compilation was then made by the now Chief Justice of the United States, its persuasive value as to that nation was nullified 11 years later by *In re Arbulich's Estate* (1953). They also rely upon an opinion of the Oregon Attorney General given in 1938 (19 Op Atty Gen 136) to the same effect. But we are informed by the State's brief in this matter that this opinion has been abandoned by that office since the holding of *Clark v. Allen,* supra, in 1947.

Much of defendants' argument rests upon the mistaken premise that "the right to receive," which is the sole right to which we give attention in this matter, is reciprocal in character. This is contrary to the conclusion of *State Land Board v. Rogers,* supra. It is only "the right to take" that demands reciprocal legislation in a foreign country. This is but another reason why we do not find the provisions of ORS 111.070 impinging upon any treaty existing between the United States and Yugoslavia.

During the course of the oral argument, counsel for the defendants laid great stress upon two diplomatic notes exchanged by the State Department and the Embassy of Yugoslavia. We were there led to believe that their net result was equivalent to a bilateral modification of the Treaty of 1881, giving to it a construction contrary to the doctrines as expressed in *Clark v. Allen,* supra, and *In re Arbulich's Estate,* supra.

This exchange was had in April, 1958, and hence not a part of the record of the trial court when it

entered its decree in this matter in April, 1957. The defendants bring these notes to our attention via the filing of a supplemental brief. We pass the question of the propriety of bringing matters of that kind to this court under the circumstances, but observe they do not have the force and effect claimed for them even if they were ever properly made a part of the record. This is made patently manifest by the concluding paragraph of the note from the State Department in response to the query from the Yugoslavian Embassy, where it stated:

"This note, of course, is not to be considered as having the character of an international agreement or as effecting any modification of the treaty [The Treaty of 1881]."

We hold that the provisions of ORS 111.070 relating to the right of American citizens to receive a foreign inheritance by delivery in the United States or its territories, does not do violence to any treaty subsisting between this country and Yugoslavia in December, 1953. We also hold that the Yugoslavian Foreign Exchange Law and Foreign Exchange Regulations enacted pursuant thereto as they were as of that date negative the concept of an unqualified and enforceable right to receive delivery of Yugoslavian inheritance in this country by an American citizen, but to the contrary make its receipt dependent upon the grace or sufferance of a Yugoslavian authority.

These conclusions make it unnecessary for us to give consideration to the claim of the defendants concerning the right of American citizens to take or inherit under Yugoslavian law or the sufficiency of the proof relating to the right of Yugoslavian citizens to receive an American inheritance without diminution by the government of that country. The failure

to prove the legal existence of any one of the three conditions required by ORS 111.070 defeats the claims of succession to an Oregon inheritance.

The decree is reversed. Each party will pay own costs.