Argued May 12, reversed and remanded June 22, 1960

In the Matter of the Estate of
AUGUST KASENDORF, Deceased.
MULLART *v.* STATE LAND BOARD
353 P. 2d 531

*Russell R. Niehaus*, Portland, argued the cause for appellant. On the briefs were Wheelock, Richardson & Niehaus, Portland.

*Catherine Zorn*, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief was Robert Y. Thornton, Attorney General, Salem.

Before McALLISTER, Chief Justice, and WARNER, SLOAN, O'CONNELL and MILLARD, Justices.

WARNER, J.

August Kasendorf died testate in Multnomah county, November 21, 1943, leaving his entire estate, consisting of real and personal property, to his brother and four sisters, who were residents and nationals of Estonia. No contact having been established with these legatees, proceedings were instituted in 1951 for the determination of heirship pursuant to §§ 19-1301, 19-1306, OCLA, as amended by ch 184, Oregon Laws 1945 (now ORS 117.510, 117.560).

The state claims that at the time of testator's death none of Kasendorf's legatees, nor his or their heirs,

resided in the United States or its territories and that by reason thereof his estate escheated to the state of Oregon pursuant to § 21-101, OCLA, and § 61-107①, OCLA (now, respectively, ORS 120.010-120.030 and ORS 111.070).

A petition or answer was also filed at a later date by the administrator of the Anna Mikli estate, seeking a determination that Anna, on the date of August Kasendorf's death, was his sole and only surviving beneficiary. The appellant, Damara Tiia Lisette Mullart, had previously laid claim to the entire estate as the only surviving kin of the testator, Kasendorf, and as the only child of her deceased mother, Anna Mikli, a sister and a named legatee of the decedent. We will hereinafter refer to the claimant as Damara and her mother as Anna.

From a decree of escheat in favor of the state, the claimant, Damara, appeals.

The pertinent provisions of August Kasendorf's will read:

> "Third: I give and bequeath unto my brother Jaan Kasendorf, residing in Adila, Hageri, Estonia; unto my sister Miina Kasendorf, residing in Adila, Hageri, Estonia; unto my sister Anna Mikli, residing in Tallinn, Estonia; unto my sister Leena Suurthal, residing in Tallinn, Estonia, and unto my sister Liisa Kasendorf, residing in Adila, Hageri, Estonia, all the rest, residue and remainder of the money in equal portions and share and share

---

① "The right of aliens not residing within the United States or its territories, to take personal property or the proceeds thereof in this state by descent or inheritance, is dependent in each case upon the existence of a reciprocal right upon the part of citizens of the United States to take personal property or the proceeds thereof in like manner within the countries of which said aliens are inhabitants or citizens, and upon the right of citizens of the United States to receive, by payment to them within the United States, or its territories, moneys originating from estates of persons dying within such foreign countries. In the event no heirs other than said aliens are found eligible to take such property, said property shall escheat to the state of Oregon, as provided by law in those cases where a person shall die intestate without heirs."

alike. My said brothers and sisters are all above legal age.

"Fourth: In the event my said above named brother or either one of my said above named sisters should die before I do and leave no lineal descendants, then and in that event, his or her or their shares shall be divided equally between my living brother and sisters, as the case may be."

The questions presented for our determination are: Who were the legatees, if any, that survived the testator, and if they were residents of Estonia on November 21, 1943, did the laws of that country as of that date meet the requirements of § 61-107, OCLA, supra, so as to entitle such Estonian legatees, or their survivors, to receive a distributive share of August Kasendorf's estate?

The conclusions and decree of the circuit court were based upon the following findings of fact:

"(1) That Damara Tiia Lisette Mullart has failed to prove that she is entitled to inherit the property of the estate of August Kasendorf;

"(2) That the required rights of United States citizens under § 61-107, O.C.L.A., have not been proven to exist as to Estonia at the time of the death of said August Kasendorf on November 21, 1943;

"(3) That it is not necessary to determine whether or not the American-Estonian Treaty of 1925 governs the disposition of the real property owned by August Kasendorf at the time of his death because no one has established his right to inherit such property;

"(4) That the beneficiaries named in the Will of August Kasendorf have not been located or heard from since before his death on November 21, 1943, and therefore are presumed to be dead; and

"(5) Finally, that the property, both real and

personal, of the estate of August Kasendorf, deceased, escheats to the State of Oregon for the benefit of the Common School Fund."

We cannot concur with the lower court's findings numbered (2), (3) and (5), but find ourselves in accord with finding numbered (4). As to finding numbered (1), we cannot agree that if we reverse the circuit court, we must find that Damara is entitled to claim her uncle's estate in this proceeding. The reasons for these conclusions will shortly follow.

The testimony of claimant's witnesses, all of whom are former nationals of Estonia, and the majority of whom are refugees, must be read with some consideration and understanding of the catastrophic events which occurred in that small republic during the years 1941 to 1943 and resulted in its complete subjugation to the Soviet authority.

Estonia is one of the three Baltic states which suffered the same tragic experiences of that period. It is a relatively small area, 18,357 square miles, slightly less than the combined areas of Lake and Harney counties of our own state, and with a population in 1940 of only 1,126,415[a]. The Russians, in June, 1941, without the formalities of war or warning, moved in and overwhelmed it with its military might. At the same time the Soviet hastily and cruelly deported about 60,000 of its people to Russia and Siberia and, in addition, exterminated many of its elderly residents. This policy of destroying or decimating families and rendering normal economic life chaotic continued long afterward.

As many persons as could escape the vigilance of the Soviet military and secret police, sought refuge in displacement camps of Sweden, some in Germany

[a] Encyc Britannica World Altas (1949) p 91.

and possibly in other countries, until they could eventually resettle themselves in lands of the free world.

Not a few found their way to the United States. The record here indicates that many, after great hardships, were able to join colonies of their fellow countrymen in New York, Chicago and Detroit and no doubt elsewhere in this country. Those who had proceeded them here formed in these cities local organizations known as Estonian Societies, dedicated primarily to assisting new refugees in finding living quarters and employment. They also utilized its facilities as a clearing house for information concerning separated families and for reports on the whereabouts or the death of those who had suffered from Soviet brutality and reprisals.

Sometime after 1941, the Germans overran Estonia and for the time forced Soviet retirement. But the Russians attacked again in 1943 and compelled the Germans to evacuate. Ever since the Russians have remained in complete control. As a result of the ebb and flow of this tide of invasion, and particularly the expulsion of the Germans by the Russions in 1943, their warring armies by bombing raids and consequent fires, destroyed large segments of the metropolitan and suburban areas of Estonia and with it went the destruction of many public buildings and valuable records which ordinarily might be expected to supply records of vital statistics and pedigree.

These conditions account in large measure for the want of more satisfactory records concerning the Kasendorf family tree and the dependence of the claimant upon hearsay to establish relationship to the decedent, August Kasendorf.

The case for the claimant is dependent primarily on the testimony of Damara and Paul Janes in estab-

lishing the relationship of Anna and Damara to August Kasendorf and the nonexistence of any other relatives surviving the testator. It was testimony admitted without objection and to which no rebuttal was offered. It stands uncontradicted.

Damara's testimony was first presented by a deposition given in Chicago in September, 1951, and later orally at the hearing held in this matter on the twenty-ninth day of July, 1957. The oral presentation follows closely that found in the deposition. We summarize it as follows: Damara was born at Narva, Estonia, on the twenty-ninth day of October, 1910. Her mother was Anna Mikli. Her knowledge concerning her mother in large measure is dependent in the first instance upon information furnished by her stepmother, Liisa Krist, who raised her to womanhood. It appears that at the time of Damara's birth and as a result of it, her mother was paralyzed. Mrs. Krist had been a friend and companion of Anna for many years. Mrs. Krist had also given birth about the same time to a baby girl who died shortly afterward. Because of this situation and the paralysis of Anna, Mrs. Mikli gave Damara to the Krists to raise. They took charge of Damara and raised her as one of their own daughters, giving her the name of Krist. It was not until Damara was about 15 years of age that she learned for the first time to her great shock and surprise that she was only a foster child and illegitimate and that she had an uncle and aunts by the name of Kasendorf living together in the county of Hageri. This knowledge was conveyed to her by Mrs. Krist, who because of the acute economic condition then prevailing in the Krist family, was prompted to suggest to Damara that she write to her uncle and aunts for some aid. Damara had on several occasions before she was five years old

been taken to the Kasendorf farm in Hageri by Mrs. Krist. She had a vague independent memory of those visits but did not know of her relationship to the Kasendorfs until revealed to her by Mrs. Krist. Among those things recalled, she has a recollection of seeing a lady walking around with crutches.

She testifies after some delay she wrote as suggested to her uncle Jaan and aunts Miina and Liisa Kasendorf and eventually received a reply to her letter for help from the aunts who said that they would help her in any way they could, but also advised that her uncle would do nothing for her.

She states that she was so shocked by the knowledge of her illegitimacy and so disappointed in learning of her uncle's attitude that she did not renew the correspondence. It also appears from her testimony that her uncle Jaan was a bachelor and his sisters, the two aunts referred to, were never married. She was told by the Krists that a third aunt, Mrs. Leena Suurthal, nee Kasendorf, had two children who died while they were young and long before the death of August Kasendorf.

Damara was married when she was 19 to Edward M. Mullart, then a lieutenant in the Engineer Corps of the Estonian Army, and from 1936 a captain. They lived in Narva until 1940. One child, Edith, was born of this marriage. She now resides with Damara in Chicago. Captain Mullart was arrested by the Russians on June 14, 1941, and as a part of the Soviet invasion of Estonia. She has never heard from him since.

From that time on the existence of Damara and her child was tragically bizarre and precarious. Under the threat of the Russians to search out, arrest and remove to Russia or Siberia the families of Estonian officers, Damara and her child were forced to go

hither and yon in Estonia and live undercover with such help as friends could give.

Damara and Edith left their native land in February, 1944, as members of a party of 44 Estonians who had surreptitiously reconditioned an old mine sweeper that had been beached near the point of their departure. They successfully reached Sweden and remained in Stockholm until May, 1949. In the intervening years she had experienced great difficulty in making a sufficient living for herself and child, being handicapped by language and hospitalized by serious illnesses. With the help of Helena Clayton, sister of her husband, living in Chicago, she was able to reach that city sometime in June, 1949.

It appears that the second of the three administrators c.t.a. of the instant estate, Mr. Sorro, a resident of Portland, of Estonian birth, had made diligent efforts during the period of his administration to locate heirs of August Kasendorf and to that end had, among other things, caused an advertisement to be printed in a newspaper published in Stockholm in the Estonian language with circulation in a large colony of Estonian refugees in that country. The paper was known as "Abrod Estonia." This notice came to Damara's attention only a very short while after she had arranged transportation to Chicago. She immediately wrote to Mr. Sorro, giving him such knowledge of her pedigree as was then available and advised him that as soon as she arrived in Chicago she would communicate with him further and this she did. We now turn to the deposition of Paul Janes.

Paul Janes was born in Estonia. He was about 40 years of age at the time of giving his deposition in Chicago, Illinois, in 1951, and was then employed in that city by the Aetna Insurance Company. Janes was

a member of the Estonian Lutheran Church there, and took part in the activities of the Estonian Society of Chicago. Janes had lived in Tartu, Estonia, most of his life and graduated from the University of Tartu in law in 1937. He did not, however, practice law, but became associated with his father in the milling business, where he was employed at the time the Russians first took over Estonia in 1940. During the period of the German occupation which followed, and fearing conscription into the German Army, he abandoned his connection with the flour mill and fled from Tartu in December, 1943, to the county of Hageri. There, he temporarily secreted himself on the farm of his uncle, Peter Kangro. It had a two-room farm house with a large kitchen, used as a living room and dining room. Occupying a bed in the corner of this room was an elderly woman about 60 years of age who was introduced to him by his relatives as Anna Mikli. He described her as a thin, elderly woman with arms and legs bandaged because of recent burns and that she was compelled by reason of her condition to spend most of her time in bed. But when she did get up "she had to use two sticks to hobble around." He was informed by the Kangros that their neighbors' house belonged to the Kasendorfs and was burned down in a bombing raid occurring just before he had arrived there. After the raid, the Kangros had gone to the Kasendorf place where they found Anna Mikli with her arms and legs badly burned.

Anna Mikli told Janes that her brother and sisters had been killed in the raid and that she was the only person left alive in their family. He also said that Anna had told him that she had a daughter named Damara who had married an officer in the Estonian Army named Mullart. She asked him if he ever saw

her daughter to tell her how sick she was. He says that Anna did not talk very much because she suffered great pain. Janes further says that Anna mentioned that she had a brother in America and a sister who died before. Mr. Janes arrived in Hageri about the middle of December, 1943, and left the home of his aunt and uncle about the middle of January following, going thence first to Tallinn, hoping to get sea passage to Finland from there. After being hidden by friends in Tallinn for about eight months, he was able to get a fishing boat to Sweden sometime in September, 1944. He remained in Sweden until April, 1949, leaving for Chicago, via Canada, where he arrived in August, 1949. He states that he met Damara shortly after his arrival there. But it was not until later that he learned that they had mutual friends in Sweden. At an Estonian Christmas party in Chicago in 1950 he again saw Damara and in a conversation about Estonia and his last Christmas in that country, "brought to mind that perhaps Mrs. Mullart was the daughter about whom Anna Mikli spoke to me there. I asked if her mother's name was Anna Mikli. She was surprised at the question, but said that [it] was. Then I related to her about seeing her mother on my uncle's farm and her condition and what she told me about her being the only relative that she had left in the world."

From the testimony of Damara we learn that she is the illegitimate daughter of Anna Mikli, a sister of August Kasendorf, the testator; a niece of Jaan Kasendorf, who resided with his sisters Miina and Liisa, described in the will as living in Adila, Hageri, Estonia, and a niece of his sister Leena Suurthal, described as living in Tallinn, the Estonian capital, in April 25, 1936, the date of the will, and that Leena had two children who had died when quite young. These

things she had learned when she was about fifteen years old through her stepmother and Anna's close friend.

Through Mr. Janes we have further confirmation of Damara's relationship to Anna; that Anna had survived her brother August and in December, 1943, was the sole surviving beneficiary named in the third provision of August's will. All parties accept the presumption that Anna and the others named in the will have been long since deceased.

■ We appreciate that this important line of testimony concerning the relationship of the claimant to the testator is hearsay. But relating as it does to the subject of pedigree, it is a species of hearsay that has statutory sanction. ORS 41.840 and 41.900. We are also mindful that hearsay evidence of family history and pedigree, though admissible, is subject to all the infirmities that conventionally characterize that species of evidence and must, therefore, be received with caution (20 Am Jur 1047, Evidence §§ 1195, 1196; 1 Jones, Evidence (4th ed), § 317) and we have so treated it in arriving at our conclusions. See, also, *Young v. State*, 36 Or 417, 59 P 812, 60 P 711; *In re Braun's Estate*, 167 Or 218, 223, 117 P2d 238.

In our evaluation we have taken notice that the reported statements of Anna to witness Janes and those of Mrs. Krist to Damara were made *ante litem motam*; that is, at times when the declarants had no motive to distort the truth and without anticipation of any litigation or contest depending upon the family relationship. *Garvin v. Western Cooperage Co.*, 94 Or 487, 497, 184 P 555 (1919); *Carfa v. Albright*, 39 Wash2d 697, 237 P2d 795, 797, 31 ALR2d 983 (1951); 5 Wigmore, Evidence (3d ed) 298, § 1483. It is an important circumstance adding more than a modicum

of persuasiveness to the truthfulness and weight to be accorded their testimony.

■ Unless the testimony of Damara Mullart and Paul Janes is absolutely false, Anna Mikli and her daughter have established their place in the genealogy of the Kasendorf family and Anna's sole heirship in the August Kasendorf estate.

There was other testimony by deposition from Estonians living in Chicago and Detroit who knew Damara, some in Sweden and some in Estonia. While their evidence, taken as a whole, does not add to the history of the Kasendorf family or Damara's relationship to the testator, it does corroborate many details of her unhappy odyssey following the loss of her husband in 1941 and continuing until her arrival in Chicago in 1949, and gives to her a reputation for trustworthiness. These depositions, like those of Damara and Janes, were admitted without objection. We refer more particularly to only one of the witnesses in this category: The Reverend Arthur Voobus, then a professor of ancient religious history in the Chicago Theological Seminary. He had fled thence after the Russian horde had invaded his native land. He appears to be a man of considerable academic training, both in the universities of Estonia and Germany, and who had held high positions in the councils of the Estonian Lutheran Evangelical Church. This was the church with which Damara was affiliated, both in her homeland and in Chicago. In response to the following questions The Reverend Voobus describes Mrs. Mullart as follows:

"Q What is your opinion of Mrs. Mullart formed from your association with her?

"A On the basis of my own experiences and my own observations, I can say frankly that she is

a trustworthy person. She is a religious leader in church work. I think and I am convinced she is a conscientious and sincere person. She told me about her birth and I think her story is trustworthy. I personally think that she told the truth.

"Q If you know of her reputation in Chicago, tell us what it is.

"A I think she enjoys a good reputation in Chicago."

Most every one of the deponents told of the impossibility of trying to get information out of Estonia since that country has been occupied by the Soviet. Indeed, they tell us that any effort to communicate with persons in Estonia exposes such persons to possible death or exile to Siberia. It seems that the Russians scrutinize all correpondence from friends of Estonians in lands where freedom prevails and subject the recipient to suspicion of a relationship inimical to the Soviet. These deponents also tell us that Estonians residing in the homeland desiring to communicate with friends or relatives abroad must bring such mail to the post-offices unsealed for inspection and leave the same for the Russian officials to mail, if they do. This line of testimony has the support of reliable historical matter of which we take notice. We mention it as explaining the futility of attempting, under the circumstances, to secure more cogent evidence than hearsay in this matter. Evidently, the state was met with the same difficulty, if it attempted to penetrate the Iron Curtain, for it offered nothing to gainsay the representations of any one of the deponents.

Having concluded that Anna Mikli was the sole legatee surviving at the time of the death of her brother August and entitled to his entire estate, we now turn to the matter of her entitlement to take her inheritance,

being, as she was, a resident and national of Estonia at the time of the death of the testator.

Section 61-107, OCLA, supra, requires of a non-resident heir two phases of proof as a condition precedent to taking and receiving any personal property by descent or inheritance: (1) proof of a reciprocal right of American citizens by descent or inheritance, or its proceeds, from a foreign estate (in this case from an Estonian estate) and in like manner as aliens (Estonians) are permitted to take in Oregon; and (2) proof of the right of American citizens to receive by payment to them in the United States or its territories moneys originating from estates of persons dying in such foreign countries. *In re Estate of Krachler*, 199 Or 448, 458, 263 P2d 769; *In re Christoff's Estate,* 219 Or 233, 347 P2d 57, 59.

■ But before giving answer to the foregoing questions concerning these two conditions precedent, we deem it important to take notice that notwithstanding the turbulent and chaotic conditions which have prevailed in Estonia since 1940, the claims of Russia to sovereignty over what once was the peaceful Republic of Estonia have never been recognized by the United States. This is not only a matter of common knowledge, but has documented attestation as exhibits in this proceeding and, ineffective as they may be in many fields of consular activity, the Department of State continues to recognize Estonian Consuls, which would include Mr. Johannes Kaiv, the Acting Consul General, with offices in New York.

■ Consul Kaiv is an Estonian lawyer who did graduate work at the Institute of International Law of the International Court at the Hague; was a member of the Department of Codification of Estonian laws and had published, personally, or jointly with others, eight

books on the law of his native land. He represented that the law of Estonia relating to the inheritance rights of foreigners was promulgated on September 13, 1938, and is as published in the State Gazette No. 79 of September 16, 1938, a certified copy of which appears in the record. As it there appears, it provides:

"*Section 1.*

"A foreigner has the right to inherit in Estonia only if an Estonian citizen in a corresponding degree of relationship and under the same conditions has the right to inherit according to the laws of the state of which the said foreigner is a citizen.

"A foreigner cannot receive a larger share of the inheritance than an Estonian citizen would receive of a similar inheritance in the said foreign country.

"*Section 2.*

"This law applies also to all such estates which are in process at the time this law becomes effective and in regard to which a court's decision confirming the inheritance rights has not yet taken legal effect."

He also asserted that it was in effect at the time of the forcible occupation of Estonia by the Russians in 1940 and still continues in effect. See, also, *In re Stoich's Estate,* 220 Or 448, 349 P2d 255, 260 (decided January 13, 1960).

The statements made by the Consul General are affirmed by the testimony of Mr. Vaino J. Riismandel, an Estonian living in the United States since 1949, and who at the time of giving his deposition was employed as a legal analyst in Estonian law in the Law Library of the Library of Congress.

Mr. Riismandel gave an affirmative reply when asked if under Estonian law, as it existed prior to the Russian occupation, an American citizen could inherit through an Estonian estate "freely and without hin-

drance and without restrictions because of nationality, religion or political affiliation."

In answer to the first question arising under § 61-107, OCLA, supra, it is apparent to us from the foregoing and particularly from the law as found in State Gazette No. 79 that an American citizen under the Estonian law had the same "right to take" or inherit as did its own nationals enjoy and "in like manner" to the laws of this state without restriction to nationality, religion or political affiliation. See *In re Blak's Estate*, 65 Cal App2d 232, 150 P2d 567, 569.

But in so saying, we limit our conclusion to the proposition that the Estonian law meets the condition of the "right to take." It does not include a provision to insure "the right to receive" as required by § 61-107, OCLA, supra. All parties are cognizant of its insufficiency in this respect. The state points to the exchange laws of Estonia as rendering the "right to receive" uncertain by reason of the discretionary powers reserved to Estonian officials who are appointed to administer those laws and the Consul General confirmed this by saying: "According to these laws and regulations [relating to foreign exchange] a license from the Bank of Estonia was necessary for export of foreign currency from Estonia."

Because of what we have to say concerning the force and effect of Art XXIV of the Treaty of 1925, we need not particularize our reasons for holding that the Estonian exchange regulations of 1940, like those of Bulgaria and Yugoslavia, stand as a bar to the right of an American heir of an Estonian estate to ultimately and with legal certainty receive payment of his legacy in the United States, as required by § 61-107, OCLA. *In re Christoff's Estate*, supra (347 P2d at 61); *In re Stoich's Estate*, supra (349 P2d at 268).

If the American heirs had to depend upon the uncertainties of the exchange laws to receive payment of their inheritance in the United States, we would feel compelled, as were we in the Christoff and Stoich estates, to deny claimant's right to take from the Kasendorf estate. But we find that an American's right to receive payment of an Estonian legacy in the United States is not dependent alone on the whims of Estonian officialdom under the exchange regulations of that country. Such an American heir could, if he had been disappointed in that direction, invoke the aid of a United States Consul, resident in Estonia, as provided by Art XXIV of the Treaty of 1925, and have that official demand receipt for and transmit to him through appropriate agencies of this government such heir's share of an Estonian estate.

Art XXIV of the Treaty of Friendship, Commerce and Consular Rights, signed by the United States and Estonia on December 23, 1925 (44 Stat 2379) reads:

"A consular officer of either High Contracting Party may in behalf of his non-resident countryman receipt for their distributive shares derived from estates in the process of probate or accruing under the provisions of so-called Workman's Compensation Laws or other like statutes provided he remit any funds so received through the appropriate agencies of his Government to the proper distributee, and provided further that he furnish to the authority or agency making distribution through him reasonable evidence of such remission."

The state concedes that this treaty has not been abrogated.

Treaties may be considered as evidence of foreign law. *Estate of Arbulich*, 41 Cal2d 86, 257 P2d 433; *In re Nepogodin's Estate*, 134 Cal App2d 161, 285 P2d

672, 680 (1955). We have no doubt that Estonia treats its treaty obligations, as does the United States, as the supreme law of the land. *Clark v. Allen*, 331 US 503, 517, 91 L ed 1633, 1645, 67 S Ct 1431.

We, therefore, hold:

1. That Jaan Kasendorf, Miina Kasendorf, Leena Suurthal and Liisa Kasendorf, respectively, the brother and three sisters of August Kasendorf, deceased, predeceased the testator without leaving lineal descendants surviving;

2. That August's sister Anna Mikli died sometime subsequent to the forepart of December, 1943;

3. That, as shown by the record of this proceeding, Damara Mullart is the daughter and only child of Anna Mikli;

4. That the laws of Estonia, as they were on November 21, 1943, supplemented by the provisions of the Treaty of 1925 between the United States and Estonia, meet the requirements of § 61-107, OCLA, supra, with respect to the rights of American citizens to take and receive inheritances in Estonian estates; and

5. That the property of the estate of August Kasendorf, when available for distribution, should be delivered to the duly appointed, qualified and acting administrator of the estate of Anna Mikli, deceased, acting pursuant to appointment of the circuit court in that estate.

Earlier in this opinion we observed that even though we reverse the circuit court, nevertheless, we cannot, in this determination of heirship, declare that Damara can rightly receive the avails of her uncle's estate from its administrator upon final distribution. It is a conclusion far less captious than may first appear. In so doing we follow the course the law directs.

We are first confronted with the admitted fact of Damara's illegitimate birth. Anna inherited her interest in her brother's estate as of the date of his death in 1943. At that time, § 16-201, OCLA, was in force and effect. Under its provisions, an illegitimate child was the heir of its mother, only, and could not inherit from the mother's kindred. This was repealed by Oregon Laws 1957, ch 411, codified as ORS 109.060 et seq, and rights of inheritance conferred as therein provided. But this law is of no assistance to Damara. If, as it appears in this proceeding, she is the sole heir of Anna, then to enjoy the benefits of Anna's estate, she must lay her claim in the forum where her mother's estate is probated and there abide in all the incidents of that separate probate.

Evidently, such a situation was contemplated, for we find in the record that Wilmot K. Royal, as administrator of the estate of Anna Mikli, deceased, then pending in the probate department of the same court, on March 27, 1952, filed the answer to the petition for determination of heirship to which we have earlier alluded in this opinion, and alleging *inter alia* that all the other legatees predeceased the testator without leaving lineal descendants; and that Anna died intestate on or about January 15, 1944, leaving surviving her as her only heir, her daughter, Damara Mullart, now residing in Chicago.

In closing this matter, we cannot avoid the observation that nearly 17 years have elapsed since Mr. Kasendorf's will was admitted to probate. During this time the property of his estate was continued in the custody of the court (*U. S. Nat. Bank v. Rawson*, 150 Or 358, 370, 43 P2d 184), sterile so far as its beneficial use was concerned by the parties entitled thereto. It is a modest estate, tendering no problems in administration

and in ordinary course could have been distributed in a short time thereafter were it not for the uncertainty of those entitled thereto. But after waiting more than five years spent in informal inquiry as to the names and location of heirs, a probable heir was found in 1950. Thereafter, in 1951, this proceeding for determination of heirship was first begun and the notice required published in May and June of that year, but it was not until August 6, 1958, that the decree appealed from was entered. We are of the opinion that the long time lapsing between the testator's death and the initiation of this determination proceeding was unwarranted, nor can we condone the lost time that followed after that was begun. We do not attempt to assess the responsibility for these delays, but mark them as delays that could have been and should have been avoided. We concede that had a determination proceeding been earlier begun, it might have resulted in an order of escheat because of the absence of any party claimants appearing. This, however, would not have denied to later-discovered claimants the right and opportunity within 10 years after entry of the escheat decree to reclaim the estate, if rightfully entitled thereto, under the provisions of ORS 120.130 et seq. Meantime, the beneficiaries of the Common School Fund would have enjoyed the use and benefit of the income from its investment.

The matter is remanded to the circuit court for entry of a decree of determination in accordance with this opinion.