Argued February 3, modified and remanded March 23, petition for
rehearing denied June 3, 1966

IN THE MATTER OF THE ESTATE OF
PAULINE SCHRADER, DECEASED
ZSCHERNIG ET AL *v.* MILLER ET AL
412 P. 2d 781
415 P. 2d 15

*Peter A. Schwabe (Sr.),* Portland, argued the cause and filed the brief for appellants.

*Walter L. Barrie,* Assistant Attorney General, Salem, argued the cause for respondents. With him

on the brief was Robert Y. Thornton, Attorney General of Oregon, Salem.

Before McALLISTER, Chief Justice, and SLOAN, DENECKE, HOLMAN and LUSK, Justices.

HOLMAN, J.

Pauline Schrader, a resident of Oregon, died intestate on September 30, 1962. She left an estate comprised of both real and personal property. Her next of kin were a brother and sister, two nieces and two nephews, all of whom are nonresident aliens residing in the Soviet-occupied zone of Germany, hereinafter referred to as East Germany.[1] These relatives, as plaintiffs, brought a proceeding for a determination of heirship in their favor. This was contested by the State of Oregon, through its State Land Board, which requested that the property be escheated to the state.

ORS 111.070[2] provides that the right of nonresi-

---

[1] By referring to this area as "East Germany" we do not pass judgment on the political question whether Germany is a divided state or country with more than one government.

[2] ORS 111.070 states as follows:

"(1) The right of an alien not residing within the United States or its territories to take either real or personal property or the proceeds thereof in this state by succession or testamentary disposition, upon the same terms and conditions as inhabitants and citizens of the United States, is dependent in each case:

"(a) Upon the existence of a reciprocal right upon the part of citizens of the United States to take real and personal property and the proceeds thereof upon the same terms and conditions as inhabitants and citizens of the country of which such an alien is an inhabitant or citizen;

"(b) Upon the rights of citizens of the United States to receive by payment to them within the United States or its territories money originating from the estates of persons dying within such foreign country; and

"(c) Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control

dent aliens to take property from Oregon estates is dependent upon (1) the reciprocal right of the citizens of the United States similarly to take property from estates in the country of which the alien is an inhabitant or citizen; (2) the right of citizens of the United States to receive in this country money originating from estates in such foreign country; and (3) proof that such aliens will receive the benefit of money or property from estates in this state without confiscation in whole or in part by such foreign country. The statute further provides that if these three prerequisites are not found to exist and there are no other heirs, the property will escheat to the State of Oregon. *State Land Board v. Pekarek,* 234 Or 74, 76-79, 378 P2d 735 (1963).

The trial court found that the evidence did not establish the existence of reciprocal rights to take property from or to receive the proceeds of East German estates at the date of decedent's death, that ORS 111.070 was valid and controlling, and that the proceeds of the estate escheated to the State of Oregon. Plaintiffs appealed.

Plaintiffs refer this court to Article IX, paragraph 3 of the Treaty of Friendship, Commerce and Navigation with the Federal Republic of Germany, October 29, 1954, 7 U.S.T. & O.I.A. 1839, TIAS No. 3593 (effective July 14, 1956), hereinafter referred to as

---

of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries.

"(2) The burden is upon such nonresident alien to establish the fact of existence of the reciprocal rights set forth in subsection (1) of this section.

"(3) If such reciprocal rights are not found to exist and if no heir, devisee or legatee other than such alien is found eligible to take such property, the property shall be disposed of as escheated property."

the 1954 Treaty, which was negotiated by the United States with the government having jurisdiction over that territory known popularly as West Germany. They contend that it extends to them, as East German residents, reciprocal rights of inheritance.

Article IX, paragraph 3, of the 1954 Treaty provides as follows:

> "Nationals and companies of either Party shall be accorded national treatment, within the territories of the other Party, with respect to acquiring property of all kinds by testate or intestate succession or under judicial sale to satisfy valid claims. Should they because of their alienage be ineligible to continue to own any such property, they shall be allowed a period of at least five years in which to dispose of it."

"National treatment" is defined by Article XXV, paragraph 1:

> "The term 'national treatment' means treatment accorded within the territories of a Party upon terms no less favorable than the treatment accorded therein, in like situations, to nationals, companies, products, vessels or other objects, as the case may be, of such Party."

This raises the question whether East German residents are entitled to the benefits of the treaty. Plaintiffs contend that all citizens of Germany, East and West, are encompassed by the terms of the treaty because the state of Germany and its nationals continue to exist despite Germany's defeat and occupation by the allied forces. This argument is founded on Art. 116(1) of the Constitution of Germany. 2 Peaslee, Constitutions of Nations 53 (2d ed, 2d printing 1956). It is also based upon the international law doctrine concerning state succession. 2 Whiteman, Digest of

International Law 754-761, 787-799 (1963). The plaintiffs correctly contend that the West German government is the only legally constituted government of the state of Germany recognized by the United States. 2 Whiteman, supra at 794-795. From this line of reasoning they deduce that the 1954 Treaty entered into with the United States by the West German government was for the benefit of all Germans.

■ Courts of law are required to interpret treaties as any other contract by giving effect to the intent of the parties as manifested by the terms thereof. *Sullivan v. Kidd,* 254 US 433, 439, 41 S Ct 158, 65 L Ed 344 (1921); *Maximov v. United States,* 373 US 49, 54, 83 S Ct 1054, 10 L Ed 2d 184 (1963); Restatement (Second), Foreign Relations § 146 (1965). Article IX, paragraph 3 of the 1954 Treaty accords "national treatment, within the territories of the other Party." The "territories" referred to are delineated by Article XXVI of the treaty, which provides, in part:

> "1. The territories to which the present Treaty extends shall comprise all areas of land and water under the sovereignty or authority of each Party, other than the Panama Canal Zone and the Trust Territory of the Pacific Islands.
>
> "2. The present Treaty shall also apply * * * to Land Berlin which for the purposes of the present Treaty comprises those areas over which the Berlin Senate exercises jurisdiction."

This language seems to say that the 1954 Treaty was meant to apply only to that geographic area of Germany over which the government of West Germany exercises its jurisdiction.

■ In the interpretation of treaties, "the meaning given them by the departments of government particu-

larly charged with their negotiation and enforcement is given great weight," *Kolovrat v. Oregon,* 366 US 187, 194, 81 S Ct 922, 6 L Ed 2d 218 (1961) ; *Sullivan v. Kidd,* supra at 442. This does not mean, however, that courts are necessarily bound by the interpretation of the executive branch. Restatement (Second), Foreign Relations § 152 (1965). The State Department of the United States has declared the position of our government with respect to Article XXVI of the 1954 Treaty as follows:

> "Pursuant to that provision in Article XXVI, therefore, the treaty applies with respect to all territory under United States jurisdiction other than that specifically excluded and to all territory under the sovereignty or authority of the Federal Republic of Germany. Consequently, the 1954 treaty does not apply with respect to the territory commonly referred to as East Germany." Letter of February 13, 1964, from Ely Maurer, Assistant Legal Adviser for European Affairs, to Attorney General of Oregon Robert Y. Thornton.

To the contrary, however, the position of the West German government, as contained in a Foreign Office certificate issued at Bonn on September 30, 1963, and introduced into evidence, is as follows:

> "It is the position of the Government of the Federal Republic of Germany that the rights granted by Article IX, Paragraph 3 of the Treaty of Friendship, Commerce and Navigation * * * are due and accorded to all German citizens. A citizenship of the Federal Republic of Germany as distinct from a citizenship of the Soviet occupied zone which might possibly give rise to a different application of Article IX, Paragraph 3 of the said treaty does not exist."

■ It is the belief of this court that neither German citizenship nor nationality has real bearing on this is-

sue because territorial application of the 1954 Treaty, by the terms of Article XXVI, is governed by sovereignty. The West German government has no sovereign authority over that geographical area known as East Germany. The interpretation of the State Department of the United States seems to us to be the only reasonable interpretation of the language of Article XXVI. We believe it was not the intent of the United States and West Germany, at the time of making the 1954 Treaty, to extend its provisions to residents of East Germany.

The situation here differs from those prevailing in the cases of *Estate of Nepogodin,* 134 Cal App 2d 161, 285 P2d 672 (1955), and *Mullart v. State Land Board,* 222 Or 463, 353 P2d 531 (1960), relied upon by plaintiffs. In those cases the relevant treaties applied to the country or state as a whole. In this case, however, the 1954 Treaty specifically provides that its geographic application is to an area less than the state of Germany as a whole and excludes the area in which plaintiffs live.

Plaintiffs contend that if the 1954 Treaty is inapplicable Articles IV and XXV of the Treaty of Friendship, Commerce and Consular Rights with Germany, December 8, 1923, 44 Stat 2132, T.S. No. 725 (effective October 14, 1925) amended June 3, 1935, 49 Stat 3258, T.S. No. 897, hereinafter referred to as the 1923 Treaty, are applicable.

■ The state of Oregon contends that the 1923 Treaty has been abrogated by virtue of subsequent events. Article XXVIII of the 1954 Treaty with the West German government provides as follows:

"The present Treaty shall replace and terminate provisions in force in Articles I through V * * *

of the treaty of friendship, commerce and consular rights between the United States of America and Germany, signed at Washington December 8, 1923 * * *."

The 1954 Treaty thus purports to abrogate Article IV of the 1923 Treaty dealing with the rights of individuals to take property. However, the 1954 Treaty, as previously pointed out, explicitly extends only to those areas over which West Germany has sovereignty. This does not include East Germany. Its provisions would therefore not affect the application of the 1923 Treaty to East Germany. This conclusion has also been reached by the United States State Department. The Department has said:

"* * * Since the Federal Republic of Germany was the Party to the 1954 Treaty the provisions of that Treaty apply solely with regard to the area of the Federal Republic of Germany. Consequently, the 1954 Treaty does not apply with respect to that part of Germany outside the Federal Republic of Germany commonly referred to as East Germany, and Article XXVIII of the 1954 Treaty does not apply with regard to East Germany. As far as East Germany is concerned, Article IV of the 1923 Treaty has not been replaced through the operation of Article XXVIII of the 1954 Treaty." Letter of February 24, 1964, from Ely Maurer, Assistant Legal Adviser for European Affairs, to Attorney General of Oregon Robert Y. Thornton.

Since the enactment of the 1923 Treaty, World War II has ensued, Germany has been defeated and occupied, and the Soviet government has created a regime in East Germany which is not recognized by the United States as a legal government. The United States government still treats East Germany as Soviet-occupied territory of Germany. No treaty of peace

has ever been consummated.[9] What then is the status of the 1923 Treaty as it relates to East Germany?

In considering whether the many changes in Germany's status would abrogate the treaty, the case of *Clark v. Allen,* 331 US 503, 67 S Ct 1431, 91 L Ed 1633 (1947), must be considered. In that case the decedent died in 1942 a resident of California leaving real and personal property there. She bequeathed her entire estate to four relatives who were nationals and residents of Germany. The Alien Property Custodian instituted an action against the executor of the estate and California heirs-at-law to determine that the California heirs-at-law had no interest in the estate and that he was entitled to the entire estate as the representative of the German nationals. The heirs-at-law claimed the German nationals were ineligible as legatees because a reciprocity requirement of California law similar to that of Oregon could not be satisfied.

■ The court there held that the 1923 Treaty between the United States and Germany was not entirely abrogated by the outbreak of World War II and the enactment of the Trading with the Enemy Act. It held that the treaty provisions regarding descent and distribution of property were still in effect. The court said as follows:

"We start from the premise that the outbreak

---

[9] No peace treaty has been signed by all the belligerents to World War II. See 1 Whiteman, Digest of International Law, 331–336 (1963). In substitution therefor, the United States, Great Britain, France, and West Germany entered into a Protocol concerning Termination of the Occupation Regime in the Federal Republic of Germany, October 23, 1954, 6 U.S.T. & O.I.A. 4117, TIAS No. 3425 (effective May 5, 1955) containing a Convention on Relations Between the Three Powers and the Federal Republic of Germany, 6 U.S.T. & O.I.A. at 4251, by which the occupying nations revoked the occupied status of Germany and retained limited rights pending reunification of Germany and a peace settlement.

of war does not necessarily suspend or abrogate treaty provisions. *Society for the Propagation of the Gospel v. New Haven,* 8 Wheat. 464, 494-495. There may of course be such an incompatibility between a particular treaty provision and the maintenance of a state of war as to make clear that it should not be enforced. *Karnuth v. United States,* 279 U.S. 231. Or the Chief Executive or the Congress may have formulated a national policy quite inconsistent with the enforcement of a treaty in whole or in part. This was the view stated in *Techt v. Hughes, supra,* and we believe it to be the correct one. * * *" 331 US 508-509.

In *Techt v. Hughes,* 229 NY 222, 128 NE 185, cert. denied 254 US 643 (1920), Cardozo, J., stated:

"* * * The question is not what states *may* do after war has supervened, and this without breach of their duty as members of the society of nations. The question is what courts are to presume that they have done. * * * President and senate may denounce the treaty, and thus terminate its life. Congress may enact an inconsistent rule, which will control the action of the courts (*Fong Yue Ting v. U.S.,* 149 U.S. 698). The treaty of peace itself may set up new relations, and terminate earlier compacts either tacitly or expressly. * * * But until some one of these things is done, until some one of these events occurs, while war is still flagrant, and the will of the political departments of the government unrevealed, the courts, as I view their function, play a humbler and more cautious part. It is not for them to denounce treaties generally, *en bloc.* Their part it is, as one provision or another is involved in some actual controversy before them, to determine whether, alone, or by force of connection with an inseparable scheme, the provision is inconsistent with the policy or safety of the nation in the emergency of war, and hence presumably intended to be limited to times of peace. The mere fact that other portions of the treaty

are suspended or even abrogated is not conclusive. The treaty does not fall in its entirety unless it has the character of an indivisible act." 229 NY at 243, 128 NE at 192.

Concerning the continued applicability of the 1923 Treaty, Mr. Justice Douglas said, in *Clark v. Allen,* supra at 513-514:

"\* \* \* We have no reliable evidence of the intention of the high contracting parties outside the words of the present treaty. The attitude and conduct under earlier treaties, reflecting as they did numerous contingencies and conditions, leave no sure guide to the construction of the present treaty. Where the relevant historical sources and the instrument itself give no plain indication that it is to become inoperative in whole or in part on the outbreak of war, we are left to determine, as *Techt v. Hughes, supra,* indicates, whether the provision under which rights are asserted is incompatible with national policy in time of war. So far as the right of inheritance of realty under Article IV of the present treaty is concerned, we find no incompatibility with national policy, for reasons already given."

■■ What of the effect of the events subsequent to the termination of World War II? Is the provision of the treaty under which the right to inherit is asserted incompatible with present national policy? At the time *Clark v. Allen,* supra, was decided the war was over and Germany had been occupied by the Allies. The court said as follows:

"It is argued, however, that the Treaty of 1923 with Germany must be held to have failed to survive the war, since Germany, as a result of its defeat and the occupation by the Allies, has ceased to exist as an independent national or international community. *But the question whether a state is in a position to perform its treaty obligations is essen-*

*tially a political question.* *Terlinden v. Ames,* 184 U.S. 270, 288. We find no evidence that the political departments have considered the collapse and surrender of Germany as putting an end to such provisions of the treaty as survived the outbreak of the war or the obligation of either party in respect to them. * * *" 331 US at 514 (emphasis ours).

The world political situation has vastly changed in the nearly twenty years since the decision in *Clark v. Allen,* supra. As previously pointed out, the Soviet government has purported to turn over power in East Germany to a regime which is not recognized by the United States. However, the executive branch of the United States government, which is charged with the negotiation and interpretation of treaties, has recently indicated publicly its attitude concerning the continued effectiveness of Article IV of the 1923 Treaty and its application to East Germany. A document published by the Treaty Affairs Staff, Office of the Legal Adviser, United States State Department dated September 30, 1965, entitled "Treaty Provisions Relating to the Rights of Inheritance and Acquisition and Ownership of Property in Force between the United States and Other Countries," states at page 19, note 3, as follows:

"[The 1954] Treaty is applicable to the area of Germany constituting the Federal Republic and Land Berlin. It appears that Article IV of the treaty of friendship, commerce, and consular rights between the United States and Germany signed on December 8, 1923 (44 Stat. 2132), which contains provisions relating to rights of inheritance of and succession to property, continues in force with respect to areas of Germany not presently included in the territory of the Federal Republic and Land Berlin. The entry into force of the 1954 treaty between the United States and the Federal Republic, which replaced and terminated Article IV of the

> 1923 treaty with respect to the area of Germany constituting the Federal Republic and Land Berlin, had no effect on the 1923 treaty with respect to the area of Germany not included in the Federal Republic and Land Berlin. * * *"

■■ This indicates that the United States government still considers Article IV of the 1923 Treaty in effect with relation to East Germany. While that attitude of the United States government is not binding upon this court in an adjudication of title to private property, *Clark v. Allen,* supra at 517, the State Department document is entitled to great weight. *Kolovrat v. Oregon,* supra at 194; *Sullivan v. Kidd,* supra at 442. This is particularly true in view of the fact that whether that part of Germany known as East Germany is in a position to perform its treaty obligations is essentially a political question. In the case of *Estate of Nepogodin,* 134 Cal App 2d 161, 285 P2d 672 (1955), the court considered whether communist control of Manchuria, the part of China where decedent's heirs resided, was such as to invalidate a treaty with Nationalist China which was used as evidence of reciprocal rights of inheritance. The court there said, at page 170:

> "* * * The ratification exchange shows that the United States Government did not then consider the conditions existing in China an unsurmountable obstacle to the effectiveness of the Treaty. It had not denounced the Treaty at the date of decedent's death. As to the ability of a foreign state to perform its treaty obligations and as to the question whether a treaty has been terminated the action of the political departments of our government is controlling. (*Clark v. Allen,* 331 U.S. 503, 514 [67 S. Ct. 1431, 91 L.Ed. 1633, 170 A.L.R. 953]; *Terlinden v. Ames,* 184 U.S. 270, 285, 288 [22 S.Ct. 484, 46 L.Ed. 534].) * * *"

In *Terlinden v. Ames,* 184 US 270, 287-288, 22 S Ct 484, 46 L Ed 534 (1902), the court said:

"* * * Where a treaty is violated by one of the contracting parties, it rests alone with the injured party to pronounce it broken, the treaty being, in such case, not absolutely void, but voidable, at the election of the injured party, who may waive or remit the infraction committed, or may demand a just satisfaction, the treaty remaining obligatory if he chooses not to come to a rupture. 1 Kent, Com. 174. * * *

"We concur in the view that the question whether power remains in a foreign state to carry out its treaty obligations is in its nature political and not judicial, and that the courts ought not to interfere with the conclusions of the political department in that regard."

*Terlinden v. Ames, Clark v. Allen,* and *Estate of Nepogodin* all say that the ability of a foreign country to comply with its treaty obligations is essentially a political question. In view of these cases and the present attitude of the State Department, we apply the principle of judicial abstention to the question of whether a foreign state is able to carry out its treaty obligations and therefore whether the United States is still bound.[4] The political department of the federal government particularly charged with the negotiation

---

[4] Restatement (Second), Foreign Relations § 152, comment c; Reporters' Note (1965) states:

"*The 'political question' doctrine as it relates to interpretation of international agreements.* The principle of judicial abstention has been applied to, among others, the following types of questions arising in litigation involving international agreements:

* * *

"(c) *Whether a foreign state still has power to carry out its treaty obligations and whether the United States is therefore still bound.* Terlinden v. Ames, 184 U.S. 270 (1902); Charlton v. Kelly, 229 U.S. 447 (1913); Clark v. Allen, 331 U.S. 503 (1947)."

and enforcement of the treaty in question has determined that the United States is still obligated. We therefore hold Articles IV and XXV of the 1923 Treaty to be still in effect as they apply to the territory of East Germany.

Plaintiffs contend that the provisions of ORS 111.070 are in conflict with Articles IV and XXV of the 1923 Treaty and that the statute must yield to the terms of the treaty. In so far as Article IV provides for the reciprocal taking of property by the nationals of one country from decedents' estates in the other upon the same conditions as citizens of such other state, it is in conformance with the reciprocal provisions of ORS 111.070 (1)(a). However, the statute in (1)(b) and (c) establishes two additional prerequisites to the vesting or taking by alien nationals of property from Oregon estates, neither of which is demanded by the treaty. These requirements are (1)(b) that citizens of the United States be able to receive payment here of money originating from estates in the foreign country and (1)(c) that beneficiaries of Oregon estates residing in such foreign country be able to receive there, without confiscation, money originating from such estates. Decedent's foreign relatives have not shown that subsections (1)(b) and (c) can be complied with as required by ORS 111.070 (2). They do not even contend that the requirements of (1)(b) can be met. However, these additional prerequisites to vesting are in contravention of the rights granted by the terms of the treaty.

A state statute in contravention of a treaty between the United States and a foreign government must yield to that treaty. *State Land Board v. Kolovrat,* 220 Or 448, 462, 349 P2d 255 (1960), rev'd on other grounds, *Kolovrat v. Oregon,* 366 US 187, 190, 81

S Ct 922, 6 L Ed 2d 218 (1961); *Clark v. Allen,* supra at 508, 517; *Hauenstein v. Lynham,* 100 US 483, 488-490, 25 L Ed 628 (1880); *Ware v. Hylton,* 3 US [3 Dall] 199, 236, 1 L Ed 568 (1796). Therefore, the requirements of ORS 111.070 (1)(b) and (c) must yield to the treaty where the treaty applies.

Having held the 1923 Treaty still in effect as to that territory of Germany known as East Germany and the provisions of ORS 111.070 (1)(b) and (c) of no effect when in conflict therewith, we must now turn to the specific provisions of the treaty for the purpose of determining whether they grant plaintiffs the right to inherit decedent's property. Article IV of the treaty provides as follows:

"Where, on the death of any person holding real or other immovable property or interests therein within the territories of one High Contracting Party, such property or interests therein would, by the laws of the country or by a testamentary disposition, descend or pass to a national of the other High Contracting Party, whether resident or non-resident, were he not disqualified by the laws of the country where such property or interests therein is or are situated, such national shall be allowed a term of three years in which to sell the same, this term to be reasonably prolonged if circumstances render it necessary, and withdraw the proceeds thereof, without restraint or interference * * *.

"Nationals of either High Contracting Party may have full power to dispose of their personal property of every kind within the territories of the other, by testament, donation, or otherwise, and their heirs, legatees and donees, of whatsoever nationality, whether resident or non-resident, shall succeed to such personal property, and may take possession thereof, either by themselves or by others acting for them, and retain or dispose of

the same at their pleasure subject to the payment of such duties or charges only as the nationals of the High Contracting Party within whose territories such property may be or belong shall be liable to pay in like cases."

This is the same article of the same treaty which was construed in *Clark v. Allen,* supra; so we again turn to that case for the construction of its terms. The court said, in reference to the second paragraph of Article IV concerning personal property, as follows:

"A practically identical provision of the Treaty of 1844 with Wurttemburg [sic], Art. III, 8 Stat. 588, was before the Court in *Frederickson v. Louisiana,* 23 How. 445. In that case the testator was a citizen of the United States, his legatees being citizens and residents of Wurttemberg. Louisiana, where the testator was domiciled, levied a succession tax of 10 per cent on legatees not domiciled in the United States. The Court held that the treaty did not cover the 'case of a citizen or subject of the respective countries residing at home, and disposing of property there in favor of a citizen or subject of the other . . . .' pp. 447-448. That decision was made in 1860. In 1917 the Court followed it in cases involving three other treaties. *Peterson v. Iowa,* 245 U.S. 170; *Duus v. Brown,* 245 U.S. 176; *Skarderud v. Tax Commission,* 245 U.S. 633.

"The construction adopted by those cases is, to say the least, permissible when the syntax of the sentences dealing with realty and personalty is considered. So far as realty is concerned, the testator includes 'any person'; and the property covered is that within the territory of either of the high contracting parties. In case of personality [sic], the provision governs the right of 'nationals' of either contracting party to dispose of their property *within the territory of the 'other' contracting party;* and it is 'such personal property' that

the 'heirs, legatees and donees' are entitled to take."
331 US 515 (emphasis ours).

■ This is dispositive of any contention of the plaintiffs in this case that the 1923 Treaty is applicable to the personal property of decedent. The treaty does not cover personal property located in this country which an American national undertakes to leave to German nationals.[9] Not being applicable, there can be no conflict between its terms and ORS 111.070 regarding disposition of decedent's personal property. ORS 111.070 controls and decedent's German relatives have not made the showing necessary to bring them within its terms.

■ Plaintiffs argue, however, that even if the provision of Article IV of the treaty is inapplicable, the personal property may not be escheated pursuant to the Oregon statute because the statute is an unconstitutional attempt by the state to invade the exclusive power of the federal government to regulate the foreign relations of the United States. They contend that the statute violates Article I, Section 10 of the United States Constitution. They imply that the subject matter of the statute is within the treaty-making power of the federal government and is an area of legislation from which the states are excluded by virtue of Article VI of the Constitution. This argument was also put to bed by *Clark v. Allen,* supra. The court was there dealing with a California statute similar to ORS 111.070. It was argued that the statute was an unconstitutional "extension of state power into

---

[9] In Clark v. Allen, as here, there was no showing as to the nationality of decedent. We are presuming, in the absence of a showing to the contrary, as the United States Supreme Court did in that case (331 U.S. at 516), that decedent was a national of the United States, her country of residence at the time of her death.

the field of foreign affairs, which is exclusively reserved by the Constitution to the Federal Government." 331 US at 516. The court held that a state statute governing the descent and distribution of property must give way only if there is a conflict with "an overriding federal policy *as where a treaty makes different or conflicting arrangements. Hauenstein v. Lynham, supra.*" 331 US at 517 (emphasis ours).

We now turn to the first paragraph of Article IV of the 1923 Treaty which pertains to real property. We again quote from *Clark v. Allen,* which states in regard to this paragraph as follows:

"The rights secured are in terms a right to sell within a specified time plus a right to withdraw the proceeds and an exemption from discriminatory taxation. It is plain that those rights extend to the German heirs of 'any person' holding realty in the United States. And though they are not expressed in terms of ownership or the right to inherit, that is their import and meaning. *Techt v. Hughes,* 229 N.Y. 222, 240, 128 N.E. 185, 191; *Ahrens v. Ahrens,* 144 Iowa 486, 489, 123 N.W. 164, 166. And see *People v. Gerke,* 5 Cal. 381; *Scharpf v. Schmidt,* 172 Ill. 255, 50 N.E. 182; *Colson v. Carlson,* 116 Kan. 593, 227 P. 360; *Goos v. Brocks,* 117 Neb. 750, 223 N.W. 13.

"If, therefore, the provisions of the treaty have not been superseded or abrogated, they prevail over any requirements of California law which conflict with them. *Hauenstein v. Lynham,* 100 U.S. 483, 488-490." 331 US at 508.

The 1923 Treaty provision has thus been construed to vest the title to real property of estates in this country in German heirs or devisees. The requirements of ORS 111.070 (1)(b) and (c) place additional requirements upon such vesting and are therefore in conflict with the treaty and are of no effect. The provisions

of the statute cannot operate to bar the right of the German heirs to inherit the real property.

The court realizes there is the practical problem of delivery of any benefits of the real property to the heirs at law in East Germany. The United States government does not recognize the regime established there and has no diplomatic relations with it. Also, the United States Treasury Department has issued the following:

"§ 211.2(a). It is hereby determined that postal, transportation, or banking facilities in general or local conditions in * * * the Russian Zone of Occupation of Germany, and the Russian Sector of Occupation of Berlin, Germany, are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value." Treasury Dept. Circular 655, revised Nov. 14, 1964, 29 Fed. Reg. 15287, 31 C.F.R. 141 (1965).

This court has determined that this official declaration may be regarded "as evidence that foreign beneficiaries would not receive their interests free from control amounting to, at least, a partial confiscation." *State Land Board v. Pekarek,* 234 Or 74, 82, 378 P2d 735 (1963).

Article XXV of the 1923 Treaty, which we have held to be still in force as applied to East Germany, provides as follows:

"A consular officer of either High Contracting Party may in behalf of his non-resident countrymen receipt for their distributive shares derived from estates in process of probate * * * provided he remit any funds so received through the appropriate agencies of his Government to the proper

distributees, and provided further that he furnish to the authority or agency making distribution through him reasonable evidence of such remission."

Plaintiffs, therefore, claim the West German Consul is authorized to receive funds for them to be invested for their benefit by the West German government until such time as they may receive the funds.

■ Although Article XXV of the 1923 Treaty was incorporated into and made a part of the 1954 Treaty, we have, in this opinion, held that the 1954 Treaty does not extend to those persons who reside in that area over which West Germany does not have sovereignty. For that reason West German consular officers have no authority under the 1954 Treaty to act for and receive property for persons residing in East Germany.

The United States government has taken a similar view that West German Consuls have no authority to act on behalf of German nationals residing in East Germany. The following is an excerpt from a letter released by the Office of the Legal Adviser, Department of State, May 23, 1962:

"The United States does not recognize the regime in Eastern Germany as either a state or a government. The United States considers that the area is under the effective control of the Soviet Union * * *.

"* * * the position of the Department of State has been that consuls of the Federal Republic are not authorized to act on behalf of German nationals residing in Eastern Germany." Quoted in Contemporary Practice of the United States Relating to International Law, 57 Am J Int'l L 403, 410 (1963).

■ The fact that plaintiffs cannot immediately receive the benefit of decedent's real property does not mean that they cannot inherit or own it because we have determined that ORS 111.070 (1) (c), which makes their ability to receive the benefits of the property in East Germany a prerequisite to vesting of title, must yield to Article IV of the 1923 Treaty with Germany, which has been construed in *Clark v. Allen,* supra, as granting the rights of inheritance and ownership. The German heirs at law are now the owners of real property in this state.

The decree of the trial court is modified in that plaintiffs are declared to be decedent's heirs at law in respect to her real property only, and these proceedings are remanded for the entry of an order determining heirship in conformance with this opinion.

**ON PETITION FOR REHEARING**

On appellant's petition for rehearing.

Peter A. Schwabe (Sr.), Portland, for the petition.

Before McAllister, Chief Justice, and Perry, Sloan, Goodwin, Denecke, Holman and Lusk, Justices.

HOLMAN, J.

Plaintiffs, in a petition for rehearing, again direct our attention to *Mullart v. State Land Board,* 222 Or 463, 353 P2d 531 (1960). That case held that Estonian nationals had a right to inherit personal as well as real property from estates in the United States of American nationals. The provisions of Article IV of the 1925 treaty with Estonia, 44 Stat 2379, T.S. No. 736, are identical with those of Article IV of the 1923 treaty with Germany construed in the principal opinion in this case. Plaintiffs argue, therefore, that the *Mullart* case requires this court to permit them to inherit the personal as well as the real property of the deceased despite the contrary holding in *Clark v. Allen,* 331 US 503, 67 S Ct 1431, 91 L Ed 1633 (1947).

██ Article IV of the Estonian treaty was not relied on in *Mullart.* The court there held that the Estonian legatee had the right to inherit because the reciprocal provision of the Oregon statute, which required that United States nationals be permitted to inherit from estates in the country of the alien heir, devisee or legatee, *was satisfied by Estonian law.* It was therefore unnecessary to consider or rely on the

effect of Article IV of the treaty. By contrast, plaintiffs' right to inherit in this case depended upon the language of Article IV of the 1923 German treaty. Therefore, there is no conflict between this court's holding in *Mullart* and the principal opinion in this case.

The petition for rehearing is denied.