IN THE MATTER OF THE ESTATE OF ESTHER
KISH, a/k/a ESTHER KISS, DECEASED.

WOLF, POPPER, ROSS, WOLF & JONES, ATTORNEYS-IN-
FACT, PLAINTIFFS-RESPONDENTS, v. TRENTON TRUST
COMPANY AND JULIUS KOVACS, EXECUTORS, ETC.,
*ET AL.*, DEFENDANTS, AND ARTHUR J. SILLS, AT-
TORNEY GENERAL OF NEW JERSEY, DEFENDANT-
APPELLANT.

Argued June 4, 1968—Decided July 31, 1968.

456

*Mr. William J. Walsh,* Deputy Attorney General, argued the cause for defendant-appellant Arthur J. Sills, Attorney General of New Jersey, *pro se* (*Mr. Elias Abelson,* Deputy Attorney General and *Mr. Walsh,* of counsel and on the brief).

*Mr. Martin Popper,* of the New York bar, and *Jesse Moskowitz,* argued the cause for plaintiffs-respondents (*Mr. Jesse Moskowitz,* attorney).

The opinion of the court was delivered by

HALL, J. This appeal derives from a proceeding instituted by the attorneys-in-fact for certain interested parties under the will of Esther Kish, a New Jersey decedent, who are nationals and residents of Hungary, to compel payment by the executors of their distributive shares. It is here on certification to the Appellate Division, 50 *N. J.* 405 (1967), granted on the petition of the Attorney General. That tribunal affirmed a judgment of the Mercer County Court, Probate Division, directing distribution to these persons.

The crucial issue presented to us—quite a different one than in the trial court and the Appellate Division—is the validity of *N. J. S.* 3A:25–10 (*L.* 1940, *c* 148) in view of the decision of the United States Supreme Court in *Zschernig v. Miller,* 389 *U. S.* 429, 88 *S. Ct.* 664, 19 *L. Ed. 2d* 683 (1968), rehearing denied 390 *U. S.* 974, 88 *S. Ct.* 1018, 19 *L. Ed. 2d* 1196 (1968), handed down after our grant of certification, which held that an Oregon statute dealing with the same subject matter, as customarily applied, infringed the federal foreign relations power exclusively committed by the United States Constitution to the President and Congress.

*N. J. S.* 3A:25–10 provides:

> *"Where it shall appear that a legatee, next of kin or beneficiary of a trust would not have the benefit or use or control of the money or other property due him, or where other special circumstances make it appear desirable that such payment should be withheld,* the court to which the fiduciary is accountable, or, in the case of a trust where the trustee was appointed other than by a court, the superior court, on motion of any person in interest, or, failing such, on motion of the attorney general, or on the court's own motion, may direct that such money or other property be paid into such court for the benefit of such legatee, next of kin, beneficiary of a trust, or such person or persons who may thereafter appear to be entitled thereto. Such money or other property so paid into court shall be paid out only by order of the court. * * *" (Emphasis added).

The reason for the measure is set forth in the statement annexed to the bill at the time of legislative introduction:

"The purpose of this statute is to authorize the deposit of monies or property in the appropriate court in cases where the transmission or payment to a beneficiary, legatee or other person resident in a foreign country *might be circumvented by confiscation in whole or in part*, as in foreign countries where assets belonging to individuals, especially when in the form of foreign credits, are often seized and wholly or largely appropriated by the Government. This statute authorizes the impounding of the fund by the court to await the time when payment can be made to the beneficiary for his own benefit, use and control. This statute is substantially similar to a recent New York statute amending section 269 of the New York Surrogate's Court Act."[1] (Emphasis added).

The testatrix here bequeathed one-half of her residuary estate for division among a list of named relatives residing in Hungary, with the share of any who should predecease to be divided among the survivors. She further provided that if, for any reason, the shares could not be paid to the Hungarian beneficiaries within 20 years after her death, that portion of her estate was to be paid over one-quarter to a church in Trenton, one-quarter to an orphanage in Pennsylvania and one-half to an individual resident in the latter state.

The Hungarian beneficiaries all gave powers of attorney to the plaintiffs, a New York law firm, to collect and forward their shares. There apparently has never been any real question of the identity of these persons as being those the testatrix intended to benefit or that they were the persons who executed the powers. The executors filed a complaint in the Probate Division, seeking allowance of their final account, *R. R.* 4:106–1 and 3, and an order of distribution, *R. R.* 4:108–1.

---

[1] The New York statute, now SCPA 2218, was amended in 1960 to add a provision that the burden of establishing whether a beneficiary would receive the benefit, use or control of the property involved is upon such beneficiary. The New Jersey law has never included such a provision.

Before the hearing thereof (the account was approved by the court at that hearing), the plaintiffs commenced this summary proceeding within the probate cause, asking for a judgment that the executors pay the shares to them as attorneys-in-fact. *N. J. S.* 3A:25–24; *R. R.* 4:117–1; *R. R.* 4:85. (It may be observed that the matter could have been determined on the executors' application for an order of distribution, without the necessity of commencing an affirmative proceeding). The executors, the contingent beneficiaries and the Attorney General were made parties defendant, the last named primarily because of his role as the protector of the public interest in the contingent charitable bequests to the church and the orphanage. See *R. R.* 4:99–7 and 4:117–6. On the return of the order to show cause he took the position, pursuant to the authority given him by *N. J. S.* 3A:25–10 (the other defendants took no real part in the proceeding), that the Hungarians shares should be paid into court because those beneficiaries would not have the full, undiminished benefit, use or control of the money if it were paid over to the attorneys-in-fact. The action proceeded as a plenary one, *R. R.* 4:85–4, and evidence, both testimonial and documentary, was offered by both sides on that question.

The trial court decided that "* * * the evidence, considered as a whole, establishes clearly and convincingly that foreign legatees residing in Hungary can receive legacies from estates of relatives in this country subject to an official rate of exchange but without confiscation or substantial diminution, and that they will have full use and control of such monies transmitted to them."

The judgment provided that the executors pay to the New Jersey attorney of the attorneys-in-fact one-half of the amount of each share, upon presentation to the executors of a proper refunding bond and release in that amount executed by the attorneys-in-fact, for transmission to the beneficiary. The latter was required to execute a receipt therefore before the United States Consul in Hungary, which was to be filed with the court. Thereupon the executors were

directed similarly to pay over the balance of the share upon presentation of a refunding bond and release therefor. Again the beneficiary was directed to execute a receipt for this balance before the Consul, likewise to be filed with the court.

The Attorney General appealed, principally on the ground that the proofs did not establish that the Hungarian beneficiaries would enjoy the full and undiminished value of their shares. The Appellate Division's affirmance, in an unreported opinion, simply stated that there was substantial credible evidence in the record to support the trial court's finding. The Attorney General's petition for certification urged not only the same ground of insufficiency of proof of the statutory requisites, but also contended that the decision conflicted with other decisions of the Appellate Division on the same subject matter.

In our grant of certification, we directed that additional and more direct testimony be taken and returned to us "with respect to the circumstances under which the agent of the beneficiaries was dealing, how the agent handles funds to be remitted and how the agent knows that the beneficiaries receive the remitted funds and the amount thereof". This was done on behalf of the attorneys-in-fact; the Attorney General offered no additional evidence, later stating that it would be impractical or impossible to offer any witness to contradict that testimony. Thereafter, before the parties' briefs were filed, *Zschernig* was decided.

The Oregon statute there involved provided that the right of a non-resident alien to take real or personal property or the proceeds thereof in Oregon is dependent:

(1) Upon the existence of a reciprocal right of a United States citizen to take property in the foreign country on the same terms as a citizen or inhabitant of that country;

(2) Upon the right of United States citizens to receive payment here of funds from estates in the foreign country; and

(3) "Upon proof that such foreign heirs, distributees, devisees or legatees may receive the benefit, use or control of money or property from estates of persons dying in this state without confiscation, in whole or in part, by the governments of such foreign countries."

The burden to establish the fact of existence of the reciprocal rights is placed upon the non-resident alien; if they are not found to exist and there is no other eligible heir, the property is to be disposed of as escheated property.

Although our statute is custodial only and contains no reciprocity requirement, we think these differences are of no significance on the question of relevancy of the decision to the New Jersey statute and its application, in view of the sweeping rationale of the opinion of Mr. Justice Douglas, dealing as it did particularly with the "benefit, use and control" requirement rather than relying on the escheat provision. Other action of that court buttresses this conclusion. On the same day *Zschernig* was handed down, the court summarily vacated the judgment of the Court of Appeals for the Second Circuit in *Goldstein v. Cox,* 389 *U. S.* 581, 88 *S. Ct.* 694, 19 *L. Ed. 2d* 781, remanding the case for further consideration in the light of *Zschernig. Goldstein* was a federal court action to declare the New York statute. also only a custodial measure, unconstitutional. The plaintiffs had sought a three-judge court at the trial level, which the District Court refused and the Court of Appeals affirmed. After the remand the Court of Appeals directed consideration of the constitutional issues by a three-judge court. 391 *F. 2d* 586 (*2d Cir.* 1968). Also the Supreme Court later denied, 391 *U. S.* 604, 88 *S. Ct.* 1864, 20 *L. Ed. 2d* 843 (1968), a motion for leave to file a petition for rehearing in *Ioannou v. New* York, a case which had been disposed of some years before by dismissal for want of a substantial federal question. 371 *U. S.* 30, 83 *S. Ct.* 6, 9 *L. Ed. 2d* 5 (1962). The case had also sought to challenge the constitutionality of the New York statute. The motion was denied on the representation of the state's Attorney General that the movant might make

a new application in the state court to withdraw the funds deposited pursuant to the statute. Mr. Justice Douglas, the author of *Zschernig,* filed a separate memorandum in which he stated that "* * * the rationale of that decision applies to custodial statutes such as New York has as well as to escheat statutes like Oregon's". 391 *U. S.,* at *p.* 604, 88 *S. Ct.,* at *p.* 1864, 20 *L. Ed. 2d,* at *p.* 843. But *cf. Matter of Laikind,* 22 *N. Y. 2d* 346, 292 *N. Y. S. 2d* 681, 239 *N. E. 2d* 550 (1968).

In *Zschernig,* the decedent died intestate, leaving real and personal property in Oregon. Her sole heirs were residents of East Germany. The state escheating authority claimed the net proceeds of the estate under the statute referred to. The state Supreme Court held, 243 *Ore.* 567, 412 *P. 2d* 781, re-hearing denied 243 *Ore.* 591, 415 *P. 2d* 15 (1966), that the heirs were entitled to inherit the real property by reason of a 1923 treaty with Germany entitled to supremacy over the Oregon statute, but that the treaty did not cover personalty. The court followed *Clark v. Allen,* 331 *U. S.* 503, 67 *S. Ct.* 1431, 91 *L. Ed.* 1633 (1947), in which the same treaty was similarly construed. It then went on to say that, as to the personality, "* * * decedent's German relatives have not made the showing necessary to bring them within [the terms of the statute]", 412 *P. 2d,* at *p.* 791, without any elaboration as to the proofs, except a reference to United States Treasury Department Circular 655 as revised (31 C. F. R. 141 (1965)) which stated that, as to East Germany and certain other countries, "* * * postal, transportation or banking facilities in general or local conditions * * * are such that there is not a reasonable assurance that a payee in those areas will actually receive checks or warrants drawn against funds of the United States, or agencies or instrumentalities thereof, and be able to negotiate the same for full value".

The Oregon court rejected an attack on the constitutionality of the statute, on its face, as a state attempt to invade the exclusive power of the federal government to regulate the foreign relations of the United States, again relying on

*Clark v. Allen, supra* (331 *U. S.* 503, 67 *S. Ct.* 1431, 91 *L. Ed.* at *pp.* 1645–1646). In the latter case, a California statute was involved which contained only reciprocity requirements. Mr. Justice Douglas, also writing for the court in that case, had held that a general reciprocity provision did not, on its face, encroach upon the federal domain.

When *Zschernig* reached the United States Supreme Court, reliance was again placed on *Clark v. Allen* to meet the appellants' constitutional argument. The court dealt with the statute on the basis of the manner of its application generally, rather than the face of its provisions. It began its discussion with this language:

> "Had that case [*Clark v. Allen*] appeared in the posture of the present one, a different result would have obtained. We were there concerned with the words of a statute on its face, not the manner of its application. State courts, of course, must frequently read, construe, and apply laws of foreign nations. It has never been seriously suggested that state courts are precluded from performing that function, although there is a possibility, albeit remote, that any holding may disturb a foreign nation—whether the matter involves commercial cases, tort cases, or some other type of controversy. At the time Clark v. Allen was decided, the case seemed to involve no more than a routine reading of foreign laws. It now appears that in this reciprocity area under inheritance statutes, the probate courts of various States have launched inquiries into the type of governments that obtain in a particular foreign nation— whether aliens under their law have enforceable rights, whether the so-called 'rights' are merely dispensations turning upon the whim or caprice of government officials, whether the representation of consuls, ambassadors, and other representatives of foreign nations are credible or made in good faith, whether there is in the actual administration in the particular foreign system of law any element of confiscation.
>
> &ast; &ast; &ast; &ast; &ast; &ast; &ast;
>
> "The Government's acquiescence in the ruling of Clark v. Allen certainly does not justify extending the principle of that case, as we would be required to do here to uphold the Oregon statute as applied; for it has more than 'some incidental or indirect effect in foreign countries,' and its great potential for disruption or embarrassment makes us hesitate to place it in the category of a diplomatic bagatelle." (88 *S. Ct.*, at *pp.* 667, 389 *U. S.*, at *pp.* 433, 434, 19 *L. Ed.* 2d, at *pp.* 688, 689).

The court went on to review the attitude and approach of the courts of Oregon in administering its statute as shown

by earlier decisions, as well as that adopted in other states, although saying nothing about the specific proofs in the case before it and making no mention of the Treasury Department Circular. Mr. Justice Douglas said, *inter alia*:

"As we read the decisions that followed in the wake of Clark v. Allen, we find that they radiate some of the attitudes of the 'cold war', where the search is for the 'democracy quotient' of a foreign regime as opposed to the Marxist theory. The Oregon statute introduces the concept of 'confiscation', which is of course opposed to the Just Compensation Clause of the Fifth Amendment. And this has led into minute inquiries concerning the actual administration of foreign law, into the credibility of foreign diplomatic statements, and into speculation whether the fact that some received delivery of funds should 'not preclude wonderment as to how many may have been denied "the right to receive" * * *.' * * *

"That kind of state involvement in foreign affairs and international developments—matters which the Constitution entrusts solely to the Federal Government—is not sanctioned by Clark v. Allen. * * *
* * * * * * *

"As one reads the Oregon decisions, it seems that foreign policy attitudes, the freezing or thawing of the 'cold war', and the like are the real desiderata. Yet they of course are matters for the Federal Government, not for local probate courts." (88 *S. Ct.*, at *pp.* 667–669, 19 *L. Ed.* 2d at *pp.* 689, 690–691).

In reversing the judgment below (presumably only as to withholding of the personalty), the court concluded:

"It seems inescapable that the type of probate law that Oregon enforces affects international relations in a persistent and subtle way. The practice of state courts in withholding remittances to legatees residing in Communist countries or in preventing them from assigning them is notorious. The several States, of course, have traditionally regulated the descent and distribution of estates. But those regulations must give way if they impair the effective exercise of the Nation's foreign policy. * * * The present Oregon law is not as gross an intrusion in the federal domain as those others might be. Yet, as we have said, it has a direct impact upon foreign relations and may well adversely affect the power of the central government to deal with those problems." (88 *S. Ct.*, at *pp.* 670–671, 19 *L. Ed.* 2d, at *p.* 692).[2]

---

[2] The opinion was joined by three others of the eight Justices who sat. Mr. Justice Stewart, in a concurring opinion joined by Mr. Justice Brennan, felt that the Oregon statute was unconstitutional on the face in its entirety:

 As we read *Zschernig,* a state custodial statute such as *N. J. S. 3A* :25–10 is valid, assuming no superseding treaty is involved, only to the extent that shares of foreign beneficiaries may be ordered withheld and deposited in court when transmission or delivery is prohibited by our federal government or where it is clear that receipt or use is forbidden or made impossible by the law of the beneficiary's country, in whatever form such law may take under that nation's governmental or jurisprudential system, to be ascertained by what Mr. Justice Douglas referred to as "a routine reading of foreign laws." State courts may not become involved in matters of the practical administration of foreign laws, not prohibitory or confiscatory on the face. Nor may they predicate a decision on comparison of political, social or economic systems or take judicial notice of so-called "common knowledge" of conditions or come to a conclusion on the basis of mere doubts. See *Berman, Soviet Heirs in American Courts,* 62 *Col. L. Rev.* 257 (1962).[3]

---

"In my view, each of the three provisions of the Oregon law suffers from the same fatal infirmity. All three launch the State upon a prohibited voyage into a domain of exclusively federal competence. Any realistic attempt to apply any of the three criteria would necessarily involve the Oregon courts in an evaluation, either expressed or implied, of the administration of foreign law, the credibility of foreign diplomatic statements, and the policies of foreign governments. * * *" (88 *S. Ct.,* at *p.* 671, 19 *L. Ed.* 2*d,* at *p.* 693).

Mr. Justice Harlan concurred in the result, being of the opinion that the 1923 treaty applied to personalty as well as realty, but that the Oregon statute was not unconstitutional either on its face or as applied. Mr. Justice White filed a dissenting opinion, feeling that the court below should be affirmed on the basis that the construction of the 1923 treaty in *Clark v. Allen* should not be overruled and that the state statute was not an impermissible interference with foreign affairs.

[3] We have earlier cited *Matter of Laikind,* 22 *N. Y.* 2*d* 346, 292 *N. Y. S.* 2*d* 681, 239 *N. E.* 2*d* 550 (1968), a decision of the New York Court of Appeals, which is the only reported case we know where the highest court of a state has been asked to consider *Zschernig.* (We have been referred to several unreported state trial court opinions since *Zschernig* holding their with-

 Fiduciaries and the courts, which have authority over them and to which they are accountable, are under an obligation to carry out the direction of the testator or settlor, or the legal direction in the case of intestacy. Implicit in that obligation is the duty to deliver monies belonging to such persons in foreign countries, and at the same time to be reasonably sure that the amount, less costs of transmission and exchange into foreign currency, can be transmitted to them through regular international banking channels, consular offices or some other legal and effective means. Although this aspect was not mentioned in *Zschernig,* we think a valid reading of our statute thus also permits withholding and payment into court where there is no present *physical* means of transmitting the payment to a beneficiary in a particular country.

 We are further of the opinion, in view of the rationale of *Zschernig* as well as the essentially negative language of our statute, that the burden should rest on the party seeking the withholding of distribution to establish that one or more of the criteria above mentioned are not met in a particular situation. *Cf. Lamb v. Estate of Szabo,* 27 *Conn. Sup.* 247, 235 *A. 2d* 849 (*Super. Ct.* 1967). Any such application must be on due notice to the beneficiary (or his

holding statutes, or the application thereof, unconstitutional under that decision). The issue there arose collaterally and the court, although suggesting the possibility of a distinction because the New York statute did not contain an escheat provision, said: "* * * petitioner has made no showing that the lower courts *in this case* have currently engaged in the conduct criticized, and additionally illustrated in the footnotes of the *Zschernig* case, as interference with foreign relations. Consequently, there is no present warrant to reconsider the earlier rulings of this Court sustaining the constitutionality of the statutes which preceded the present one * * *" (Emphasis supplied). (Slip opinion, *p.* 5). Chief Judge Fuld in dissent, however, stated: "The determination now being made—which authorizes the Surrogate to withhold release of the decedent's funds * * *—seems to me to be violative of the policies enumerated by the Supreme Court in its recent decision in *Zschernig v. Miller* * * *" (Slip opinion).

attorney-in-fact, if a proper power of attorney has been filed with the court, or his New Jersey attorney or that of the consul of his country, if one has previously entered an appearance), in connection with an application for an order for distribution or some other appropriate proceeding.

There can be no doubt that the application of *N. J. S. 3A:25–10* by New Jersey courts in the past—and, indeed, in this very case—has been constitutionally erroneous under *Zschernig*. All the reported opinions amply demonstrate, without now going into detail, inquiry into and reliance upon considerations condemned by *Zschernig* and far beyond those we have just outlined as permissible. See *In re Url, 7 N. J. Super.* 455 (*Co. Ct.* 1950), appeal dismissed 5 *N. J.* 507 (1950); *In re Volencki,* 35 *N. J. Super.* 351 (*Cty. Ct.* 1955); *In re Estate of Markewitsh,* 62 *N. J. Super.* 407 (*Cty. Ct.* 1960); *Brizgys v. County Treasurer of Union Co.,* 84 *N. J. Super.* 485 (*App. Div.* 1964), certification denied *Brizgys v. Styler,* 43 *N. J.* 270 (1964); *In re Estate of Birkner,* 90 *N. J. Super.* 91 (*Cty. Ct.* 1966) (the only reported case where distribution was ordered). *Cf. In re Simon,* 20 *N. J. Super.* 375 (*App. Div.* 1952), affirmed o. b. 10 *N. J.* 531 (1952); *In re Estate of Alexandravicus,* 35 *N. J.* 230, 237–238 (1961), *s.c.,* 83 *N. J. Super.* 303 (*App. Div.* 1964), certification denied 43 *N. J.* 128 (1964).

■ Although the evidential inquiry in the case at bar followed the customary pre-*Zschernig* approach, with the attorneys-in-fact assuming the burden, the proofs they presented, particularly in the testimony taken following the grant of certification, very adequately established that the Hungarian beneficiaries will have the use, benefit and control of their shares and that a direction to distribute is eminently correct, even on that approach. No treaty is involved and there is clearly no federal prohibition against the transmission of private funds to Hungary. It is further beyond question that Hungarian law allows resident citizens to receive and use for personal purposes inheritances from this country without governmental interference or substantial diminution. The

official rate of exchange of such dollar funds is more than double that prescribed for commercial remittances. Transmission is regularly accomplished through delivery of the monies to a New York City bank which credits in dollars the account with it of the Hungarian National Trust Bank in Budapest (the governmental institution which handles foreign banking transactions). This bank makes the exchange into Hungarian currency and transmits the resulting sum to the General Bank for Trust and Trade Co., Ltd., which attends to actual delivery to the heir in accordance with his instructions. That delivery is accompanied by a detailed statement of the computation of the sum received by the beneficiary, for which the latter executes a receipt which is returned to the transmitter in the United States. The New York bank makes a small charge for its services and the only deductions in Hungary are 1% by each of the banks there plus actual expenses. All of this was well established in this case by the uncontradicted testimony of representatives of the attorneys-in-fact and of the New York bank and that of two members of the Hungarian bar, taken in this country, who are on the legal staff of the General Bank for Trust and Trade Co., Ltd. in Hungary.

In his post-*Zschernig* brief in this court, the Attorney General makes only two points worthy of comment. The first is that the transmission and exchange method just outlined amounts to substantial diminution of a Hungarian distributive share because more Hungarian forints to the dollar may be purchased in New York City on the so-called "free" foreign exchange market than the official non-commercial exchange rate in Hungary produces. We do not think that the rate of exchange of dollars for local currency is ordinarily an appropriate consideration under *Zschernig*. See *Berman, supra,* 62 *Col. L. Rev.,* at *pp.* 266–268. Besides, the testimony of the Hungarian lawyers here is clear that, in common with the foreign exchange regulations of many nations, it is illegal to bring or transmit forints into that country. No court of this state should be a party to a violation of foreign law

by authorizing purchase of currency on the "free" market for attempted transmission to a foreign nation in payment of a distributive share.

Secondly, the Attorney General urges that distribution here be withheld until such time as Hungary is removed from the list of countries set forth in the United States Treasury Regulation, 31 C.F.R. § 211.3(a), originally adopted in 1951 and since amended on several occasions, which we previously quoted, as applied to East Germany, in connection with the Oregon Supreme Court opinion in *Zschernig*. That regulation forbade transmission of governmental checks or warrants. In any event, the suggestion has become completely moot since oral argument herein, because Hungary was removed from the list on June 27, 1968, 33 *Fed. Reg.* 9611.[4] Even if this were not the fact, although the inclusion of a country on the Treasury list has been utilized as a basis for withholding distribution of estate shares (see *In re Estate of Markewitsh, supra* (62 *N. J. Super.* 407); *Brizgys v. County Treasurer of Union Co., supra* (84 *N. J. Super.*, at *pp.* 498–500)), we do not consider this to be a valid basis for such action, so long as there are reliable means of delivery of private monies to the beneficiary in the particular country and the law of that country does not dictate confiscation. It does not amount to a prohibition with respect to non-governmental funds and it obviously was not considered sufficient in *Zschernig* to sustain withholding. As the record in our case indicates, treasury determinations in this regard may well involve political or other considerations not relevant to remittances of private funds. See also *Berman, supra*, 62 *Col. L. Rev.*, at *pp.* 264–265.

Nothing we have said is intended to affect the obligation of a fiduciary to insist on adequate proof of identity of a foreign beneficiary, or the requirement of state law in estate

---

4 Poland, Bulgaria, Romania and Czechoslovakia were previously removed and we are advised that Estonia, Latvia, Lithuania and the Union of Soviet Socialist Republics have been deleted since the action with respect to Hungary.

matters that the beneficiary, personally or by a duly authorized attorney-in-fact, give a refunding bond, *N. J. S.* 3A :25–13 and 14, or the right of a fiduciary to demand a similarly executed release, properly acknowledged and authenticated for recording. If the foreign beneficiary is unrepresented by New Jersey counsel and payment is made directly by the fiduciary, delivery should be conditioned on appropriate execution of the refunding bond and release, which may also include a detailed receipt showing the computation of the net amount delivered to him. We assume, of course, that a New Jersey attorney, representing such a recipient or an attorney-in-fact, will always insist on such a receipt for his own protection, which he should file with the court, since he is responsible in this situation, as in all other cases, for delivery to the ultimate client of the amount due him.

While the plaintiffs did not cross-petition for certification with respect to the form of the order for distribution, presumably because *Zschernig* had not then been decided, they now suggest that the order should be modified to direct immediate distribution of the Hungarian beneficiaries' entire shares in a single payment to their New Jersey attorney upon presentation of refunding bonds and releases duly executed by the attorneys-in-fact, rather than, as the order presently provides, payment in two installments, the second conditioned upon the filing of a personally executed receipt by the distributee for the first. We think the point is well taken under the rationale of *Zschernig* and the order will be so modified.

■ One other aspect of the matter should be mentioned. Although the powers of attorney from the Hungarian beneficiaries to plaintiffs are not included in the appendices, it appears from the testimony taken after the grant of certification and the court's inquiry at oral argument that they call for a deduction of 20% of the total dollar amount of each share, as well as actual expenses connected with the collection and litigation, by the attorneys-in-fact for their legal services and those of their New Jersey attorney, to be divided equally

between them. In view of a court's inherent power to pass upon the reasonableness of fees charged in connection with any matter before it, any fee arrangement set forth in such a power of attorney is subject to judicial review. A court should make inquiry in these situations as to the existence of any such percentage arrangement, since the client is in a foreign country, is bound to be unfamiliar with appropriate fees and charges here, and cannot personally be heard. While the amount the specified percentage would produce in this case does not appear unreasonable in light of the extended litigation, the figure seems clearly excessive as far as future matters are concerned since, by reason of the criteria and procedure we have outlined, adversary litigation will not ordinarily be required.

The proper practice is for the New Jersey attorney to apply to the court, pursuant to *R. R.* 4:107–3, for an allowance out of the distributee's share for his services and those of any out-of-state attorney, plus their expenses, based on the nature and extent of the actual services rendered, with any percentage specified in a power of attorney representing only the maximum amount which the court may allow. (We think this procedure need not be followed in this case in view of what we have said about the extensive services rendered). In this connection attention is called, with respect to the division of fees between a New Jersey and an out-of-state attorney, to Canon of Professional Ethics 34, generally requiring such to be based upon a division of service or responsibility, and to *R. R.* 4:107–3 providing that the division shall be set forth in the order of allowance in a probate cause.

The order of distribution of the County Court, Probate Division, is modified as set forth herein, and, as so modified, it and the judgment of the Appellate Division are affirmed.

*For modification and affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.